1                                     HONORABLE JAMES L. ROBART

2

3

4

5

6

7

8                       **UNITED STATES DISTRICT COURT**
             **FOR THE WESTERN DISTRICT OF WASHINGTON**
9                              **AT SEATTLE**

10

11   PENNSYLVANIA AVENUE FUNDS, On Behalf )   Case No.: 2:06-cv-01737 JLR
     of Itself and All Others Similarly Situated,       )
12                                       )
                                      )
13                 Plaintiff,          )   **PLAINTIFF'S OPPOSITION**
                                      )   **TO DEFENDANTS**
14                                         )   **FRANCISCO PARTNERS,**
   v.                                       )   **L.P.,GLADIATOR**
15                                         )   **CORPORATION, FRANCISCO**
                                      )   **PARTNERS II, L.P.,**
16                                         )   **FRANCISCO PARTNERS**
                                      )   **PARALLEL FUND II, L.P.,**
17   EDWARD J. BOREY, STEVEN N. MOORE,   )   **DAVID STANTON, DIPANJAN**
   MICHAEL  R.  KOUREY,  MICHAEL  R. )   **DEB, VECTOR CAPITAL**
18   HALLMAN,  RICHARD  A.  LeFAIVRE, )   **CORPORATION, VECTOR**
   WILLIAM  J.  SCHROEDER,  FRANCISCO )   **CAPITAL III, L.P., AND**
19   P A R T N E R S ,   L . P . , G L A D I A T O R )   **ALEXANDER R. SLUSKY'S**
   CORPORATION, FRANCISCO PARTNERS II, )   **MOTION TO DISMISS**
20   L.P., FRANCISCO PARTNERS PARALLEL )   **PLAINTIFF'S ANTITRUST**
   FUND  II,  L.P.,  VECTOR  CAPITAL )   **CLAIMS**
21   CORPORATION,  VECTOR  CAPITAL  III, )
   L.P.,ALEXANDER  R.     SLUSKY,  DAVID )   NOTE ON MOTION CALENDAR:
22   STANTON, DIPANJAN DEB,             )   Motion Report Date,
                                      )   October 19, 2007.
23                                        )
               Defendants.           )
24                                        )
       _____ )   ORAL ARGUMENT REQUESTED
25

26

27

28

# TABLE OF CONTENTS

I.     INTRODUCTORY STATEMENT .......................................... 1

II.    THE FACTS ALLEGED IN THE FIRST AMENDED COMPLAINT .............. 2

III.   STANDARDS FOR MOTION TO DISMISS A SHERMAN ACT CLAIM .......... 5

IV.   ARGUMENT ........................................................ 6

      A.     THE PROHIBITION OF BID RIGGING UNDER SECTION 1 OF THE
             SHERMAN ACT ..................................................... 6

      B.     PLAINTIFF HAS PLAUSIBLY ALLEGED SHERMAN ACT LIABILITY BY
             THE PRIVATE EQUITY DEFENDANTS ............................... 8

            1.     Contract, Combination or Conspiracy ............................ 9

            2.     Unreasonable Restraint of Trade .............................. 11

            3.     Affect on Interstate Commerce ............................... 12

      C.     THE MARKET FOR CORPORATE CONTROL OF WATCHGUARD IS AN
             ECONOMICALLY SIGNIFICANT MARKET ......................... 13

V.     THE SHERMAN ACT APPLIES TO THE ANTICOMPETITIVE ACTIVITIES OF THE
      PRIVATE EQUITY DEFENDANTS ...................................... 15

      A.     THERE IS NO "PLAIN REPUGNANCY" WITH THE WILLIAMS ACT AND
             THE SHERMAN ACT ............................................. 15

      B.     THE ACQUISITION OF VOTING SECURITIES CONSTITUTES "TRADE OR
             COMMERCE" UNDER THE SHERMAN ACT ....................... 17

VII.   CONCLUSION ...................................................... 19

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
ANTITRUST CLAIM
NO. 2:06-cv-01737-JLR

i

FINKELSTEIN & KRINSK, LLP
501 WEST BROADWAY, SUITE 1250
SAN DIEGO, CA 92101
TELEPHONE: (619)238-1333

1                 **TABLE OF AUTHORITIES**

2

3                   **FEDERAL CASES**

4

5   American Societyii of Mechanical Engineers, Inc. v. Hydrolevel Corp.

6       456 U.S. 556 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

7   Apex Hosery Co. v. Leader

8       310 U.S. 469 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

9   Bell Atlantic Corp. v. Twombly

10      __ U.S. __, 127 S.Ct. 1955 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8-11

11   Business Elecs. Corp. v. Sharp Elecs. Corp.

12      485 U.S. 717 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 16

13   Continental T.V., Inc. v. GTE Sylvania Inc.

14      433 U.S. 36 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

15   Credit Suisse Sec. (USA) LLC v. Billing

16      __ U.S. __, 127 S.Ct. 2383 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

17   Doe v. U.S.

18      419 F.3d 1058 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

19   eMag Solutions, LLC v. Toda Kogyo Corp.

20      426 F.Supp.2d 1050 (N.D.Cal. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

21   Erickson v. Pardus

22      __ U.S. __ , 127 S.Ct. 2197 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

23   Finnegan v. Campeau Corp.

24      915 F.2d 824 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

25   Freeman v. San Diego Assn of Realtors

26      322 F.3d at 1144 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

27   Freeman v. San Diego Ass'n of Realtors

28      322 F.3d 1133 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11

1   FTC v. Indiana Fed'n of Dentists

2      476 U.S. 447 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

3   Gordon v. New York Stock Exchange, Inc.

4      422 U.S. 659 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-18

5   In re OSB Antitrust Litig.

6      2007 WL 2253419 (E.D.Pa. Aug. 3, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

7   In re Rubber Chemicals Antitrust Litig.

8      __ F.Supp.2d __, 2007 WL 2348715, *11 (N.D.Cal. Aug. 15, 2007) . . . . . . . . . . . . 9, 11

9   In re Tableware Antitrust Litig.

10     363 F.Supp.2d 1203 (N.D.Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

11  JTC Petroleum Co. v. Piasa Motor Fuels, Inc.

12     190 F.3d 775 (7th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

13  Lee v. City of Los Angeles

14     250 F.3d 668 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

15  McGlinchy v. Shell Chemical Co.

16     845 F.2d 802 (9th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

17  McGlinchy v. Shell Chemical Co.

18     845 F.2d at 811 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

19  Metro Indus., Inc. v. Sammi Corp.

20     82 F.3d 839 (9th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

21  Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.

22     924 F.2d 1484 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

23  Nat'l Collegiate Athletic Ass'n. v. Bd. of Regents of Univ. of Okla.

24     468 U.S. 85 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 13

25  Nat'l Society of Prof'l Eng'rs v. United States

26     435 U.S. 679 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

27

28

1  Neilson v. Union Bank of California, N.A.

2      290 F.Supp.2d 1101 (C.D.Cal. 2003) ........................................... 5

3  Northern Pac. R.R. Co. v. United States

4      356 U.S. 1 (1958) ...................................................... 6

5  Northern Pac. R.R. Co. v. United States

6      356 U.S. at 5 ....................................................... 11

7  Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.

8      472 U.S. 284 (1985) ................................................... 6

9  Rebel Oil Co., Inc. v. Atlantic Richfield Co.

10      51 F.3d 1421 (9th Cir. 1995) ........................................ 1, 16

11  Rondeau v. Mosinee Paper Corp.

12      422 U.S. 49 (1975) .................................................... 16

13  Rothberg v. Nat'l Banner Corp.

14      259 F.Supp. 414 (E.D.Pa. 1966) ................................... 12, 18

15  Schreiber v. Burlington Northern, Inc.

16      472 U.S. 1 (1985) ................................................ 16, 17

17  Silver v. New York Stock Exchange

18      373 U.S. 341 (1963) ............................................... 16,18

19  Summit Health, Ltd. v. Pinhas

20      500 U.S. 322 (1991) ................................................... 12

21  Tanaka v. Univ. of So. Cal.

22      252 F.3d 1059 (9th Cir. 2001) ........................................... 8

23  U.S v. W.F. Brinkley & Son Const. Co., Inc.

24      783 F.2d 1157 (4th Cir. 1986) ........................................... 8

25  U.S. v. Koppers Co., Inc.

26      652 F.2d 290 (2nd Cir. 1981) ........................................... 8

27

28

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
ANTITRUST CLAIM
NO. 2:06-cv-01737-JLR                                    iv

FINKELSTEIN & KRINSK, LLP
501 WEST BROADWAY, SUITE 1250
SAN DIEGO, CA 92101
TELEPHONE: (619)238-1333

1  United States v. Bensinger Co.

2      430 F.2d 584 (8th Cir.1970) ................................................. 7

3  United States v. Celanese Corp. of Am.

4      91 F.Supp. 14 (S.D.N.Y. 1950) ............................................. 12

5  United States v. MMR Corp.

6      907 F.2d 489 (5th Cir.1990) ................................................ 8

7  United States v. Mobile Materials Inc.

8      881 F.2d 866 (10th Cir. 1989) .............................................. 2

9  United States v. Nat'l Ass'n of Sec. Dealers, Inc.,

10     422 U.S. 694 (1975) ....................................................... 18

11 United States v. Philadelphia Nat'l Bank

12     374 U.S. 321 (1963) .............................................. 12, 17,18

13 United States v. Socony-Vacuum Oil Co.

14     310 U.S. 150 (1940) ....................................................... 18

15 United States v. Young Bros., Inc.

16     728 F.2d 682 (5th Cir. 1984) ............................................. 7, 11

17                               **STATUTES**

18 15 U.S.C. § 1 ............................................................... 17

19 15 U.S.C. § 78n(e) ......................................................... 17

20 15 U.S.C. § 78s(f) ......................................................... 17

21 17 C.F.R. § 240.14e-3 ...................................................... 17

22 374 U.S. at 323-324 ........................................................ 18

23 374 U.S. at 340 ............................................................ 17

24

25

26

27

28
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS                    FINKELSTEIN & KRINSK, LLP
ANTITRUST CLAIM                                          501 WEST BROADWAY, SUITE 1250
NO. 2:06-cv-01737-JLR                                         SAN DIEGO, CA 92101
                                            V                TELEPHONE: (619)238-1333

1  Plaintiff Pennsylvania Avenue Funds ("Plaintiff"), an institutional investor representing the

2  putative shareholder class, hereby respectfully submits the following Memorandum of Law in

3  Opposition to the Motion to Dismiss Plaintiff's Antitrust Claims brought by Defendants Francisco

4  Partners, L.P. ("FP,") Gladiator Corporation ("Gladiator,") Francisco Partners II, L.P. ("FP II,")

5  Francisco Partners Parallel Fund II, L.P. ("FP Parallel II,") David Stanton ("Stanton,") Dipanjan Deb

6  ("Deb,") Vector Capital Corporation ("Vector,") Vector Capital III, L.P. ("Vector III,") and

7  Alexander Slusky ("Slusky").[1]

8  ## I.    INTRODUCTORY STATEMENT

9  The brazenmanner in which the Private Equity Defendants manipulated the acquisition of

10  WatchGuard Technologies, Inc. ("WatchGuard") under the standards of today's private equity deals,

11  makes this is an important case. Huge swaths of the American economy are being bought from

12  public shareholders by private equity firms. According to highly respected antitrust economists,

13  collusive bidding in the market for corporate control can have negative social welfare effects by

14  underpricing – and therefore encouraging the underutilization of – corporate assets. *See* Hebert

15  Hovenkamp, *Antitrust Violations in Securities Markets*, 28 J. CORP. L. 607, 620 (2003); Joshua M.

16  Fried et al., *Collusive Bidding in the Market for Corporate Control*, 79 NEB. L. REV. 48, 72 (2000);

17  R. Preston McAfee et al., *Collusive Bidding in Hostile Takeovers*, 2 J. ECON. MGMT. STRATEGY 449,

18  450 (1993). As allocative efficiency is the central goal of the Sherman Act, the Private Equity

19  Defendants' rigged bids for the corporate control of WatchGuard puts this case squarely in the cross-

20  hairs of the antitrust laws. Rebel Oil Co., Inc. v. Atlantic Richfield Co., 51 F.3d 1421, 1444 (9th Cir.

21  1995).

22  The economic significance of anticompetitive behavior in the private equity takeover context

23  was brought to bear last year by the Department of Justice ("DOJ"). In October 2006, news reports

24  confirmed that the DOJ has initiated an investigation by sending letters of inquiry to major players

25

26  [1] FP, Gladiator, FP II, FP Parallel II, Stanton and Deb are collectively referred to as the "FP
   Defendants." Vector, Vector III and Slusky are together referred to as the "Vector Defendants."
27  Collectively, the FP Defendants and the Vector Defendants are referred to as the "Private Equity
   Defendants."

28

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
ANTITRUST CLAIM
NO. 2:06-cv-01737-JLR

FINKELSTEIN & KRINSK, LLP
501 WEST BROADWAY, SUITE 1250
SAN DIEGO, CA 92101
TELEPHONE: (619)238-1333

1

1  in the private equity industry. According to industry experts, as reported in the October 13, 2006
2  edition of the *Financial Times*, the DOJ is investigating private equity firms' potential collusion and
3  bid-rigging. In particular, the DOJ is focused on whether the private equity "players" work together
4  to establish prices and fix the value of bids in order to keep the targets' price low. These practices
5  impede the target (*i.e.*, WatchGuard) from running a fully competitive auction and realizing
6  maximum value for stockholders.

7      The Private Equity Defendants attempt to characterize their activities as a "joint bid" for
8  WatchGuard. This is nonsense. A joint bid occurs when two parties decide *prior to bidding* that they
9  will submit their bid jointly *as one bid*, in contemplation that they would operate the company
10 together. Hovenkamp, 28 J. CORP. L. at 619. When, as happened in this case, two parties begin by
11 bidding against each other, and one agrees simply to stand down, letting the other win the bid, the
12 two are involved in (possibly criminal) bid rigging. *Id., citing*, United States v. Mobile Materials
13 Inc., 881 F.2d 866 (10th Cir. 1989), *cert. denied*, 493 U.S. 1043. *See*, 12 HERBERT HOVENKAMP,
14 ANTITRUST LAW ¶ 2005 (1999) (discussing price fixing in auction markets.) The fact that the Private
15 Equity Defendants attempt to escape liability by labeling their bid rigging activities as joint bids is
16 irrellevant, and this Court should hand out liability accordingly. *See, e.g.,* ANTITRUST GUIDELINES
17 FOR COLLABORATIONS AMONG COMPETITORS (U.S. Federal Trade Commission and Department of
18 Justice, April 2000) § 3.2, at 8 ("labeling an arrangement a 'joint venture' will not protect what is
19 merely a device to raise price or restrict output; the nature of the conduct, not the designation, is
20 determinative").

21 **II.    THE FACTS ALLEGED IN THE FIRST AMENDED COMPLAINT**

22      WatchGuard is a provider of Internet security solutions that are designed to protect small to
23 medium-sized businesses in using the Internet for e-commerce and secure communications. See,
24 First Amended Complaint ("Compl.") ¶ 29. Before being acquired and taken private in October 2006
25 by the Private Equity Defendants (the "Acquisition") (Compl. ¶ 69,) WatchGuard was publicly
26 traded on the NASDAQ as "WGRD." Compl. ¶ 29.

27

28

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
ANTITRUST CLAIM
NO. 2:06-cv-01737-JLR

2

FINKELSTEIN & KRINSK, LLP
501 WEST BROADWAY, SUITE 1250
SAN DIEGO, CA 92101
TELEPHONE: (619)238-1333

1    FP, and its affiliate entities and persons (the FP Defendants), together represent a technology
2    focused private equity firm located in San Francisco, CA. Compl. ¶¶ 17-22, 74. Gladiator, FP II, and
3    FP Parallel II contributed funding for the Acquisition on behalf of FP. Compl. ¶¶ 18-21. Defendants
4    Stanton and Deb are the founders and managing partners of FP. Compl. ¶¶ 21-22. Defendant Slusky
5    is the founder and managing partner of Defendant Vector, a technology focused (Compl. ¶ 74)
6    private equity corporation also headquartered in San Francisco, California. Compl. ¶¶ 24, 26.
7    Defendant Vector III is a wholly owned subsidiary of Vector (Compl. ¶ 25) that provided funding
8    for the Acquisition on behalf of Vector and Slusky. Compl. ¶¶ 65, 134-137.

9    The Private Equity Defendants are both Internet and technology focused private equity funds
10   with considerable portfolio holdings and market power in the computer and Internet sector. Compl.
11   ¶¶ 74, 75, 142. For example, Vector owns, *inter alia*, Safenet, Inc. (Internet security,) LANdesk
12   Software (systems and management IT software,) UUNet (enterprise Internet access,) and Quintus
13   (e-commerce relationship management software). Compl. ¶ 74. FP owns Barracuda Networks
14   (enterprise-class spam, spyware, virus and IM threat protection), Blue Coat (secures web
15   communications and accelerates business applications), GXS (business to business integration
16   software), OfficeTiger (information processing systems for financial institutions), and XcelleNet
17   (remote and mobile network software). Compl. ¶ 75. In buying WatchGuard, the Private Equity
18   Defendants were seeking complementary assets for their holdings in the software and technology
19   product markets. Compl. ¶ 142. (*See*, Compl. ¶¶ 74 and 75 for an itemized list of the Private equity
20   Defendants' *extensive* portfolio of technology companies as of the filing date of the Complaint).

21   Under the stewardship of the Directors Defendants,[2] WatchGuard performed poorly, with
22   desultory financial results and steadily declining revenues. Compl. ¶¶ 30 - 32. WatchGuard's poor
23   performance caused inquiries from prospective strategic partners/investors to surface, with interest
24   directed at a potential merger or acquisition. Compl. ¶ 32.

25

26   [2] "Director Defendants" refers to WatchGuard's former directors, Edward J. Borey, Steven
27   N. Moore, Michael R. Kourey, Michael R. Hallman, Richard A. LeFaivre, and William J. Schroeder,
     also named as defendants in this action for their breaches of fiduciary duty in connection with the
28   WatchGuard Acquisition.

| PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS ANTITRUST CLAIM NO. 2:06-cv-01737-JLR | 3 | FINKELSTEIN & KRINSK, LLP 501 WEST BROADWAY, SUITE 1250 SAN DIEGO, CA 92101 TELEPHONE: (619)238-1333 |
|---|---|---|

On February 17, 2006, Vector submitted a letter to the Director Defendants expressing, *inter alia,* "[Vector's] strong interest in acquiring WatchGuard [] via an all-cash merger or tender offer that would provide a significant premium to [WatchGuard] shareholders." Compl. ¶ 36. Vector's February 17, 2006 letter (the "February 17 Letter") also stated that "[Vector] ha[d] formed a fundamental investment thesis regarding the Company's potential in the enterprise security solution sector and ha[d] become a significant shareholder of the Company." *Id.*

In response to the February 17 Letter, Vector was provided confidential information and access to WatchGuard's internal, confidential books and records from WatchGuard management and other agents of WatchGuard, including Wachovia, WatchGuard's legal counsel, and three of WatchGuard's value added resellers regarding business, financial and legal matters (Compl. ¶¶ 37, 53) solely for the purpose of allowing Vector to make a formal bid for WatchGuard. Compl. ¶ 52.

On May 22, 2006, FP submitted to the Director Defendants a conditional bid of $5.00 per share. Compl. ¶ 46. Then on May 26, 2006, Vector offered to purchase WatchGuard for cash consideration of $5.10 per share through a statutory merger. Compl. ¶ 47. After these initial bids, Vector and FP continued to conduct due diligence into WatchGuard's business, plans, prospects and assets. Compl. ¶¶ 51-54.

On June 26, 2006, FP offered $4.60 per share; later that same day, Vector separately offered $4.65 per share. Compl. ¶ 50. Thereafter, Vector and FP agreed that Vector would withdraw its bid or otherwise refrain from pursuing an acquisition of the Company for $4.65 per share. Compl. ¶¶ 54, 73. This was to facilitate FP – which had yet to make a formal bid – to offer $4.25 per share unopposed, any other suitors having dropped out, and with knowledge that Vector would vote, or cause its shares to be voted, for the $4.25 bid. Compl. *Id.* For its participation in the scheme, FP allowed Vector a fifty percent stake in the going private transaction for WatchGuard. Compl. *Id.* The Private Equity Defendants exchanged information on bids pricing and due diligence (Compl. ¶ 143), and agreed among themselves on $4.25 as the buyout price. *Id.*

Vector thereafter dropped out of the bidding contest (Compl. ¶ 64), and on July 25, 2006, it was announced that the Director Defendants had agreed to accept *from FP*, consideration of $4.25

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
ANTITRUST CLAIM
NO. 2:06-cv-01737-JLR

FINKELSTEIN & KRINSK, LLP
501 WEST BROADWAY, SUITE 1250
SAN DIEGO, CA 92101
TELEPHONE: (619)238-1331

4

1  per share. Compl. ¶ 56. On August 16, 2007, after the proposed Acquisition had been announced
2  to the shareholders (Compl. ¶ 57), the Private Equity Defendants formalized their agreement that
3  required, *inter alia*, Vector to withdraw from the bidding process to facilitate acceptance of FP's bid
4  of $4.25, in exchange for 50% of the Acquisition via a letter agreement (the "Letter Agreement").
5  Compl. ¶ 65.

6  When the Acquisition was finalized on October 4, 2006 (Compl ¶ 69), per the Letter
7  Agreement, Vector funded 50% of the Acquisition consideration by contributing cash and
8  WatchGuard common stock to Gladiator and received 50% of the now private WatchGuard. Compl.
9  ¶¶ 25, 65, 109. As a result of the Private Equity Defendants collusive behavior, Plaintiff and the
10  Class were paid less for WatchGuard shares than they wold have paid in a competitive marketplace.
11  Compl. ¶ 146.

## III.   STANDARDS FOR MOTION TO DISMISS A SHERMAN ACT CLAIM

13  A motion to dismiss for failure to state a claim under Section 1 of the Sherman Act shall be
14  denied if the complaint pleads "enough fact to raise a reasonable expectation that discovery will
15  reveal evidence of illegal agreement." Bell Atlantic Corp. v. Twombly, __ U.S. __, 127 S.Ct. 1955,
16  1959 (2007) (*citing* Fed. R. Civ. P. 8(a)(2)). "Rule 8(a)(2) requires only 'a short and plain statement
17  of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the
18  statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon
19  which it rests.'" Erickson v. Pardus, __ U.S. __, 127 S.Ct. 2197, 2200 (2007) *citing*, Twombly.

20  "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the
21  factual allegations contained in the complaint" (*id.*) and "construe the complaint in the light most
22  favorable to the plaintiff, ... drawing all reasonable inferences from the complaint in [plaintiff's]
23  favor. Doe v. U.S., 419 F.3d 1058, 1062 (9th Cir. 2005). "The task of the court in ruling on a Rule
24  12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of
25  the evidence which might be offered in support thereof." Neilson v. Union Bank of California, N.A.,
26  290 F.Supp.2d 1101, 1151 (C.D.Cal. 2003) (internal citations and quotations omitted). And "factual

28  PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
ANTITRUST CLAIM
NO. 2:06-cv-01737-JLR

FINKELSTEIN & KRINSK, LLP
501 WEST BROADWAY, SUITE 1250
SAN DIEGO, CA 92101
TELEPHONE: (619)238-1333

5

1 challenges to a plaintiff's complaint have no bearing on the legal sufficiency of the allegations under

2 Rule 12(b)(6)." Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001).

3 Consequently, Plaintiff's Sherman Act claim must not be dismissed pursuant to Rule 12(b)(6)

4 unless the facts alleged are insufficient to state a claim or an insurmountable bar appears on the face

5 of the complaint.

## IV. ARGUMENT

### A. THE PROHIBITION OF BID RIGGING UNDER SECTION 1 OF THE SHERMAN ACT

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 ("Section 1"). However, Section 1 is intended to prohibit only "unreasonable" restraints of trade. Nat'l Collegiate Athletic Ass'n. v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 98 (1984). Under most circumstances, whether particular concerted action violates Section 1 of the Sherman Act requires case-by-case application of the so-called "rule of reason." Under the rule of reason, "the *factfinder* weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (1988) (internal citations and quotations omitted; emphasis added).

Certain categories of agreements, "because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore [*per se*] illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." Northern Pac. R.R. Co. v. United States, 356 U.S. 1, 5 (1958). *Per se* illegality is appropriate for "conduct that is manifestly anticompetitive" (Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 50 (1977)), "that would always or almost always tend to restrict competition." Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 289-290 (1985) (citations omitted). Price fixing and its derivative, bid rigging, are the type of agreements that have been held to be manifestly anti-competitive. Nat'l Society of Prof'l Eng'rs v. United States, 435 U.S. 679, 692 (1978) (noting that "[p]rice is the 'central nervous system of the economy' " and holding that "an

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
ANTITRUST CLAIM
NO. 2:06-cv-01737-JLR

FINKELSTEIN & KRINSK, LLP
501 WEST BROADWAY, SUITE 1250
SAN DIEGO, CA 92101
6      TELEPHONE: (619)238-1333

agreement that 'interferes with the setting of price by free market forces' is illegal on its face") (citations omitted).

Bid rigging "is a price-fixing agreement of the simplest kind, and price-fixing agreements are per se violations of the Sherman Act." United States v. Bensinger Co., 430 F.2d 584, 589 (8th Cir.1970) (*superceded in part by Rule on other grounds*). *See also*, United States v. Young Bros., Inc., 728 F.2d 682, 689 (5th Cir. 1984) (rigged bids among competitors per se illegal) *cert. denied*, 469 U.S. 881; JTC Petroleum Co. v. Piasa Motor Fuels, Inc., 190 F.3d 775, 777 (7th Cir.1999) (Posner, C.J.) In a bid rigging case, "[t]he dispositive question generally is not whether any price fixing was justified, but simply whether it occurred." Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1144 (9th Cir. 2003) (citations omitted).

According to the Department of Justice, bid rigging can take several forms, but almost always has one thing in common, "an agreement among some or all of the bidders which predetermines the winning bidder and limits or eliminates competition." *Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For*, ANTITRUST PRIMER, (United States Department of Justice) at 3, *available at* http://www.usdoj.gov/atr/public/guidelines/211578.pdf.

The DOJ explained the most common forms of bid rigging as follows:

**Bid Suppression**: In bid suppression schemes, one or more of the competitors who otherwise would be expected to bid, or who have previously bid, agree to refrain from bidding or withdraw a previously submitted bid so that the designated winning competitor's bid will be accepted."

**Complementary Bidding**: Complementary bidding (also known as "cover" or "courtesy" bidding) occurs when some competitors agree to submit bids that either are too high to be accepted or contain special terms that will not be acceptable to the buyer. Such bids are not intended to secure the buyer's acceptance, but are merely designed to give the appearance of genuine competitive bidding. Complementary bidding schemes are the most frequently occurring forms of bid rigging, and they defraud purchasers by creating the appearance of competition to conceal secretly inflated prices.

* * *

**Subcontracting**: Subcontracting arrangements are often part of a bid-rigging scheme. Competitors who agree not to bid or to submit a losing bid frequently receive subcontracts or supply contracts in exchange from the successful low bidder. In some schemes, a low bidder will agree to withdraw its bid in favor of the next low bidder in exchange for a lucrative subcontract that divides the illegally obtained higher price between them.

---

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
ANTITRUST CLAIM
NO. 2:06-cv-01737-JLR                                    7

FINKELSTEIN & KRINSK, LLP
501 WEST BROADWAY, SUITE 1250
SAN DIEGO, CA 92101
TELEPHONE: (619)238-1333

1    *Id.*, at 2-3 (emphasis added). *See also*, U.S. v. Koppers Co., Inc. 652 F.2d 290, 294 (2nd Cir. 1981)

2    *cert denied,* 454 U.S. 1083 (bid suppression); U.S v. W.F. Brinkley & Son Const. Co., Inc., 783 F.2d

3    1157, 1159-60 (4th Cir. 1986) (complementary bidding); United States v. MMR Corp., 907 F.2d

4    489, 492-97 (5th Cir.1990), *cert. denied,* 499 U.S. 936 (subcontracting).

5          Whether or not the Private Equity Defendants' activities constituted bid rigging or can

6    properly be characterized as a "joint bid" (FP Def's Br., at 7:6-17) depends on what ***actually***

7    ***occurred***. If the Private Equity Defendants ***in fact*** had a secret agreement that Vector would drop

8    out of the bidding process in exchange for the ability to buy fifty percent of the WatchGuard

9    Acquisition after it had been approved by the Director Defendants and publicly announced to the

10   shareholders, then the Private Equity Defendants have committed a per se violation of the Sherman

11   Act. *See*, Freeman v. San Diego Assn of Realtors, 322 F.3d at 1144 ("[t]he dispositive question

12   generally is not whether any price fixing was justified, but simply whether it occurred"); Twombly,

13   *supra*, 127 S.Ct. at 1959 (test on a motion to dismiss is whether plaintiff has pled "enough fact to

14   raise a reasonable expectation that discovery will reveal evidence of illegal agreement").[3]

15        **B.    PLAINTIFF HAS PLAUSIBLY ALLEGED SHERMAN ACT LIABILITY
             BY THE PRIVATE EQUITY DEFENDANTS**

16

17        To state a claim for a *per se* violation of Section 1 of the Sherman Act, a plaintiff must plead:

18   "(1) the defendants entered into a contract, combination, or conspiracy; (2) this agreement

19   unreasonably restrained trade under either a *per se* rule of illegality or a 'rule of reason' analysis; and

20   (3) the restraint affected interstate commerce." eMag Solutions, LLC v. Toda Kogyo Corp. 426

21   F.Supp.2d 1050, 1054 (N.D.Cal. 2006) *citing*, Tanaka v. Univ. of So. Cal., 252 F.3d 1059, 1062 (9th

22   Cir. 2001).

23

24   [3] *See also* Compl. ¶ 73. ("**Plaintiff is not alleging joint bidding or other joint venture by
     the Private Equity Defendants that would be permissible under the antitrust laws**. Rather, the
     Private Equity Defendants, after initially submitting independent bids for WatchGuard, agreed that

25   Vector would withdraw its bid or otherwise refrain from bidding, and take other action that would

26   facilitate the Private Equity Defendants acquiring corporate control of WatchGuard for the lowest
     possible price. The Private Equity Defendants communicate and share price information in order

27   to proceed. For its participation in the scheme, FP allowed Vector a fifty percent stake in the going

28   private transaction for WatchGuard.")

| PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS ANTITRUST CLAIM NO. 2:06-cv-01737-JLR | 8 | FINKELSTEIN & KRINSK, LLP 501 WEST BROADWAY, SUITE 1250 SAN DIEGO, CA 92101 TELEPHONE: (619)238-1333 |
|---|---|---|

1    To state a claim in a "rule of reason" case, the plaintiff must also assert facts showing an
2   actual injury to competition, beyond the impact on the claimant, within a field of commerce in which
3   the claimant is engaged. *See*, McGlinchy v. Shell Chemical Co., 845 F.2d 802, 811 (9th Cir.1988);
4   *see also*, Metro Indus., Inc. v. Sammi Corp., 82 F.3d 839, 847-48 (9th Cir.1996). To show an injury
5   to competition, the plaintiff must "'delineate a relevant market and show that the defendant plays
6   enough of a role in that market to impair competition significantly.'" Metro Indus., *supra* (citations
7   omitted).

8    1.    Contract, Combination or Conspiracy

9    The Supreme Court recently held that a complaint must set forth "plausible grounds ... to
10   raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Twombly,
11   127 S.Ct. at 1959. In Twombly, the Supreme Court found that allegations that the defendants:

12       "conspired to restrain trade (1) by engaging in parallel conduct in their respective
         service areas to inhibit the growth of upstart CLECs; and (2) by agreeing to refrain
13       from competing against one another, as indicated by their common failure to pursue
         attractive business opportunities in contiguous markets and by a statement by one
14       ILEC's chief executive officer that competing in another ILEC's territory did not seem
         right"
15
    did not meet the plausibility pleading requirement. *Id*. at 1958.

16   A few courts have had the opportunity to decide what allegations create "plausible grounds."

17   In In re OSB Antitrust Litig., 2007 WL 2253419 (E.D.Pa. Aug. 3, 2007) (*slip opinion*), the plaintiffs

18   made allegations of price fixing in the market for oriented-strand board. The plaintiffs alleged both

19   that the market was highly concentrated and that the conspiracy was maintained through secret

20   meetings and a bi-weekly published price list. *Id*. at *4. Judge Diamond held the parallel conduct

21   by itself could have been the defendants' natural reactions to conditions in the oriented-strand board

22   market. When combined with the plaintiffs' explicit allegations that the defendants discussed price

23   fixing at industry events and enforced the agreement through a published price list, however, it was

24   sufficient to sustain a claim under Twombly. *Id*. at *6. Similarly, in In re Rubber Chemicals

25   Antitrust Litig., __ F.Supp.2d __, 2007 WL 2348715, *11 (N.D.Cal. Aug. 15, 2007), Judge Jenkins

26   held that allegations of meetings at trade shows that detailed who was present at the meetings and

27   how they were involved in fixing prices were sufficient to allege a conspiracy when coupled with

28
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS                    FINKELSTEIN & KRINSK, LLP
ANTITRUST CLAIM                                               501 WEST BROADWAY, SUITE 1250
NO. 2:06-cv-01737-JLR                                             SAN DIEGO, CA 92101
                                         9                    TELEPHONE: (619)238-1333

parallel pricing. Furthermore, there were allegations of certain individuals' involvement in the price-fixing meetings and the steps taken to fix prices and enforce the agreement. *Id.* at *11.

Plaintiff's operative Complaint alleges far more than the mere parallel conduct held insufficient in Twombly. First, the "Private Equity Defendants, ... submitt[ed] purportedly independent bids." Compl. ¶ 4. The first bids came from FP and Vector on May 22, and May 26, 2006, respectively. Compl. ¶¶ 46, 47. FP's initial bid was $5.00 per share, and Vector's $5.10. *Id.* Then on June 26, 2006, FP and Vector *both* lowered their bids to $4.60 and $4.65, respectively. Compl. ¶ 50. It was

> [o]n or about June 26, 2006 that Vector and FP entered into a contract, combination or conspiracy to artificially fix the price, refrain from bidding, or rig the tender offer bids for WatchGuard shares. Vector and FP agreed that Vector would withdraw from the bidding process, or otherwise refrain from pursuing an acquisition of the Company for $4.65 per share. This was to facilitate FP, – which had yet to make a formal bid – to offer $4.25 per share unopposed, any other suitors having dropped out, and with knowledge that Vector would vote, or cause its shares to be voted, for the $4.25 bid.

Compl. ¶ 54. Thus, Plaintiff has described the alleged agreement in full.

Then, "[o]n July 25, 2006 the Directors announced they had entered into a definitive agreement [] to accept $4.25 per WatchGuard share, an 18% decrease from earlier offers." Compl. ¶ 56. Finally,

> [o]n August 16, 2007, Vector, having earlier dropped out of formal bidding pursuant to its contract, combination or conspiracy with FP to do so, by and through its wholly owned subsidiary Vector III agreed to purchase 50 percent of the voting shares or other like interests in Gladiator that were subsequently converted, exchanged, or merged into the outstanding, publicly owned shares of WatchGuard (the "Letter Agreement"). The Letter Agreement formalized the Private Equity Defendants' contract, combination, or conspiracy that required, *inter alia*, Vector to withdraw from the bidding process to facilitate acceptance of FP's bid of $4.25, in exchange for 50% of the Acquisition.

Compl. ¶ 65.

Plaintiff has also alleged the duration of the agreement. Compl. ¶ 140 (from "approximately June 26, 2006 and ended approximately October 4, 2006 when the Acquisition was approved by WatchGuard shareholders"). Plaintiff alleged the actions taken by the Private Equity Defendants to effectuate their agreement. Compl. ¶ 142 (Private Equity Defendants " (a) work[ed] among themselves for the purpose of rigging their bids for WatchGuard; (b) exchang[ed] information among

| PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS ANTITRUST CLAIM NO. 2:06-cv-01737-JLR | 10 | FINKELSTEIN & KRINSK, LLP 501 WEST BROADWAY, SUITE 1250 SAN DIEGO, CA 92101 TELEPHONE: (619)238-1333 |
|---|---|---|

1  themselves on bids pricing in connection with their Acquisition of WatchGuard; (c) agree[d] among
2  themselves as to the amount to offer in connection with the WatchGuard Acquisition; (d) submitt[ed]
3  bid(s) for WatchGuard shares at an agreed-upon price in connection with the Acquisition; and (e)
4  monitor[ed] and implement[ed] the agreement to control the price paid by the Private Equity
5  Defendants").

6       Despite the Private equity Defendants' statement that "[Plaintiff's] assertions of conspiracy
7  are bare" (FR Def' Br., at 7:27), Plaintiff has alleged facts at least as plausible as those described
8  above and found to be sufficient in In re OSB Antitrust Litig. and In re Rubber Chemicals Antitrust
9  Litig., *supra*.

10       2.     Unreasonable Restraint of Trade

11       Pleading that the restraint on trade was "unreasonable," for activities that constitute *per se*
12  illegality, requires pleading facts that plausibly assert that the illegal agreement occurred. *See*,
13  Northern Pac. R.R. Co., 356 U.S. at 5 (certain types of agreements "*conclusively presumed to be*
14  *unreasonable* and therefore [*per se*] illegal without elaborate inquiry as to the precise harm they
15  have caused or the business excuse for their use") (emphasis added); United States v. Young Bros.,
16  728 F.2d at 689 (rigged bids among competitors per se illegal); Freeman v. San Diego Ass'n of
17  Realtors, 322 F.3d at 1144 (In a bid rigging case, "[t]he dispositive question generally is not whether
18  any price fixing was justified, but simply whether it occurred."). Therefore, since Plaintiff has pled
19  facts that plausibly allege an illegal bid rigging scheme has taken place, Plaintiff has also properly
20  pled an unreasonable restraint on trade. Twombly, 127 S.Ct. at 1959.

21       However, the Private Equity Defendants' rigged bids for WatchGuard also had an "actual
22  injury to competition, beyond the impact on the claimant, within a field of commerce in which the
23  claimant is engaged." *See*, McGlinchy, 845 F.2d at 811. From an economic perspective,

24       the premium of the share value over the value of the current use offers a deterrent to
         those who might put the assets to a low-value use; thereby holding out for a high-
25       value use. It is important to realize that this premium serves a socially useful purpose:
         if the share price is too low, then the asset may be put to an inefficiently low-value
26       use.

27

28
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS          FINKELSTEIN & KRINSK, LLP
ANTITRUST CLAIM                                   501 WEST BROADWAY, SUITE 1250
NO. 2:06-cv-01737-JLR                                 SAN DIEGO, CA 92101
                                        11            TELEPHONE: (619)238-1333

1  Joshua M. Fried et al., *Collusive Bidding in the Market for Corporate Control*, 79 NEB. L. REV. 48,
2  72 (2000); *id.*, at 74 (using econometric modeling to analyze collusive bidding in the market for
3  corporate control and determining that "once the takeover process has occurred, collusion is harmful
4  to the shareholder since it (1) decreases the price paid and (2) diverts a portion of the price to
5  someone other than the shareholder"); *see also*, Part V(C), *infra*; Hebert Hovenkamp, *Antitrust*
6  *Violations in Securities Markets*, 28 J. CORP. L. 607, 620 (2003); Compl. ¶ 146 ("Plaintiff and
7  members of the Class were paid less for WatchGuard shares sold the Private Equity Defendants than
8  they wold have paid in a competitive marketplace, unfettered by Defendants' collusive and unlawful
9  price-fixing and/or bid rigging.")

10       3.      Affect on Interstate Commerce

11       The Supreme Court has said that an affect on interstate commerce is a "jurisdictional
12 requirement[]" for applicability of the Sherman Act. Summit Health, Ltd. v. Pinhas, 500 U.S. 322,
13 322 (1991). The affect on interstate commerce is easy to ascertain in this instance as WatchGuard
14 was a publicly traded corporation, with its shares listed on the NASDAQ, trading symbol "WGRD."
15 Compl. ¶ 29. *See*, Rothberg v. Nat'l Banner Corp., 259 F.Supp. 414, 416-17 (E.D. Pa. 1966) (where
16 plaintiff alleged "defendants [were] engaged in a conspiracy to manipulate the market in National
17 Banner stock and to control the price at which all such shares of stock should be sold," plaintiff
18 "clearly alleged a cause of action under the antitrust laws").[4] No more is required of Plaintiff's
19 Complaint.

20

21

22

23

24       [4] The Celler-Kefauver Antimerger Act (15 U.S.C. § 18, "Acquisition By One Corporation
of Stock of Another") was Congress' response to judicial holdings that found mergers outside the
25 scope of the Clayton Act. *See*, United States v. Celanese Corp. of Am., 91 F.Supp. 14 (S.D.N.Y.
1950). As a response to the proliferation of mergers, Congress manifested a clear intent to bring
26 consolidations and mergers within the ambit of the antitrust laws. Consequently, Congress amended
27 the Clayton Act to provide for an assets-acquisition provision to subject mergers to antitrust scrutiny.
*See*, United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 340 (1963) ("Congress primarily sought
28 to bring mergers within § 7 and thereby close what it regarded as a loophole in the section.")

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
ANTITRUST CLAIM
NO. 2:06-cv-01737-JLR

12

FINKELSTEIN & KRINSK, LLP
501 WEST BROADWAY, SUITE 1250
SAN DIEGO, CA 92101
TELEPHONE: (619)238-1333

## C. THE MARKET FOR CORPORATE CONTROL OF WATCHGUARD IS AN ECONOMICALLY SIGNIFICANT MARKET

For a *per se* violation of Section 1 such as bid rigging, a plaintiff is not required to allege a relevant market. In re Tableware Antitrust Litig., 363 F.Supp.2d 1203, 1206 (N.D.Cal. 2005) (because plaintiffs pled per se violations of Section 1, "plaintiffs need not plead a relevant market (as they would need to do for a section 2 claim), nor do they need to plead the harm to competition, something which is presumed in a per se case"). *See*, Nat'l Collegiate Athletic Assn., 468 U.S. at 109 ("As a matter of law, the absence of proof of market power does not justify a naked restriction on price or output").[5]

Although not necessary to the Court's determination of Plaintiff's bid rigging claim, according to the Private Equity Defendants' oft-quoted Professor Hovenkamp (PE Mtn. at 15,) the market for *corporate control* of a single, publicly traded company is a properly defined "relevant market," over which a person or entity can gain market power. Hebert Hovenkamp, *Antitrust Violations in Securities Markets*, 28 J. CORP. L. 607, 620 (2003).

Economically speaking,

> ... individual securities, or even large groups of them, lack market power, even if the firm whose ownership they represent is a monopolist. ...  [ ¶ ]
>
> **The market for corporate control differs from the market for passive investment**, however. Passive investors are simply balancing return against risk, and the full range of available investments goes into their calculus. **The market for corporate control is more complex.** First, it may involve investors who simply wish to acquire a company and perhaps give it new management. In such cases the firm's equities or assets are one among many business alternatives, and significant market power would be extremely rare.
>
> **But the market for corporate control also consists of specialized assets and specialized buyers, and such buyers may have market advantages over alternative buyers.** For example, an **underpriced** grocery chain may be more valuable to prospective buyers that already own grocery stores and can service the acquired stores from existing facilities. Or a manufacturer may expand its production capacity or its product line by acquiring a firm in the **same, or a complementary,**

---

[5] While anticompetitive effect is often proven through analysis of the relevant market definition and market power, it can also be proven through *actual* anticompetitive effects. FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 460-61 (1986). In this case, the anticompetitive effects are easily seen by the 18% drop in consideration received by Plaintiff and the Class for their shares.

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
ANTITRUST CLAIM
NO. 2:06-cv-01737-JLR

13

FINKELSTEIN & KRINSK, LLP
501 WEST BROADWAY, SUITE 1250
SAN DIEGO, CA 92101
TELEPHONE: (619)238-1333

1

**enterprise. In such cases a smaller universe of 'preferred' purchasers may be able to wield monopoly power, or market power levied on the buyers' side.** Thus the shares of even a **struggling** grocery chain may be worth $40 each to investors generally; but they might be worth $50 to two other grocery chains who view the acquired company as a way of **extending their own market, and perhaps reducing costs.** Acting with perfect information, these two might **anticompetitively fix their purchase price** at something just above $40.

2

3

4

5

The extent to which this is true depends on the circumstances. For example, if a grocery chain is in trouble because it is too small to take advantage of modern chain store distribution technology, purchase by a different group of neutral investors will leave them with the same inefficiently small chain. However, purchase by an existing grocery chain may enable the buyer to merge the new stores into its own and serve all of them efficiently; or in an extreme case it might create an efficient chain out of two inefficiently small ones. In such cases, the **shares of the acquired store could be worth substantially more to the grocery chain buyer than to the neutral investor.**

6

7

8

9

10

**In cases such as these, the relevant market for a firm's shares could be much smaller than the securities market generally, and is driven by general antitrust product and geographic market considerations.**

11

12

Hovenkamp 28 J. Corp. L. at 620.

13

Plaintiff's operative Complaint describes precisely the situation recognized by Professor

14

Hovenkamp where specialized buyers (the Private Equity Defendants) can exercise market control

15

over the buyout share price of a struggling corporation (WatchGuard) with specialized assets

16

(Internet security solutions).

17

WatchGuard was a struggling "provider of Internet security solutions" (Compl. ¶ 29), that

18

"[u]nder the Director [Defendant]s' stewardship, failed to perform as promised [and] WatchGuard's

19

revenues steadily declined." Compl. ¶ 30. The Private Equity Defendants, are "both Internet and

20

technology focused [private equity] funds with considerable portfolio holdings and market power

21

in the computer and Internet sector." Compl. ¶¶ 74, 142.

22

For example, Vector owns, *inter alia,* Safenet, Inc. (Internet security), LANdesk Software

23

(systems and management IT software), UUNet (enterprise Internet access), and Quintus (e-

24

commerce relationship management software). Compl. ¶ 74. FP also owns Barracuda Networks

25

(enterprise-class spam, spyware, virus and IM threat protection), Blue Coat (secures web

26

communications and accelerates business applications), GXS (business to business integration

27

software), OfficeTiger (information processing systems for financial institutions), and XcelleNet

28

| PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS ANTITRUST CLAIM NO. 2:06-cv-01737-JLR | 14 | FINKELSTEIN & KRINSK, LLP 501 WEST BROADWAY, SUITE 1250 SAN DIEGO, CA 92101 TELEPHONE: (619)238-1333 |

1 (remote and mobile network software). *See*, Compl. ¶ 74 and 75 for an itemized list of the Private
2 equity Defendants' *extensive* portfolio of technology companies as of the filing date of the
3 Complaint.

4 It is undisputable that WatchGuard's "Internet security solutions ... designed to protect small
5 to medium-sized businesses in using the Internet for e-commerce and secure communications"
6 (Compl. ¶ 29), is a complimentary asset to the Private Equity Defendants' internet security and
7 secure communications holdings, which would be worth more to the Private Equity Defendants than
8 to the market generally. *See*, Compl. ¶ 36 (excerpt from Vector's February 17, 2006 letter to
9 Director Defendants "We have formed a fundamental investment thesis regarding the Company's
10 potential in the enterprise security solution sector and have become a significant shareholder of the
11 Company"). In this situation, the "relevant market for [WatchGuard]'s shares could be much smaller
12 than the securities market generally, and is driven by general antitrust product and geographic market
13 considerations." Hovenkamp, *supra*.

14 After the Private Equity Defendants had conducted extensive due diligence (Compl. 37, 52),
15 they were able to anticompetitively set the buyout price of WatchGuard relative to its value as part
16 of their own technology holdings. *See*, Hovenkamp at 620 ("Acting with perfect information, these
17 two might anticompetitively fix their purchase price at something just above [the trading price].")
18 Accordingly, there is a properly defined and "plausible" relevant market.[6]

19 **V.    THE SHERMAN ACT APPLIES TO THE ANTICOMPETITIVE ACTIVITIES OF
        THE PRIVATE EQUITY DEFENDANTS**

20
21 **A.    THERE IS NO "PLAIN REPUGNANCY" WITH THE WILLIAMS ACT
            AND THE SHERMAN ACT**

22 In Credit Suisse Sec. (USA) LLC v. Billing, __ U.S. __, 127 S.Ct. 2383, 2392 (2007), the
23 Supreme Court held that, to find preclusion of the antitrust laws by the securities laws, four factors
24 are "critical:" "(1) an area of conduct squarely within the heartland of securities regulations; (2) clear

25
26

27 _____
[6] *See*, Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd., 924 F.2d 1484, 1489 (9th Cir.
28 1991) ("Ordinarily, the relevant market is a question of fact for the jury.")

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
ANTITRUST CLAIM
NO. 2:06-cv-01737-JLR                                    15

FINKELSTEIN & KRINSK, LLP
501 WEST BROADWAY, SUITE 1250
SAN DIEGO, CA 92101
TELEPHONE: (619)238-1333

1 and adequate SEC authority to regulate; (3) active and ongoing agency regulation; and (4) **a serious**
2 **conflict** between the antitrust and regulatory regimes." *Id.*, at 2397 (emphasis added).

3 If *any one* of the above "critical" factors is not satisfied, Plaintiff's Sherman Act claim is not
4 precluded because "repeal of the antitrust laws is to be regarded as implied only if necessary to make
5 the Securities Exchange Act work, and even then only to the minimum extent necessary." *Id.*, at
6 2390 *citing*, Silver v. New York Stock Exchange, 373 U.S. 341, 357 (1963). The Supreme Court
7 in Silver stated that a court should utilize "an analysis which reconciles the operation of both [the
8 securities and antitrust statutory schemes] with one another rather than holding one completely
9 ousted." 373 U.S. at 357; *see also*, Gordon v. New York Stock Exchange, Inc., 422 U.S. 659, 682
10 (1975) ("implied repeal" of the antitrust laws would be found only "where there is a plain
11 repugnancy between the antitrust and regulatory provisions") (internal citations omitted).[7]

12 In this case, Plaintiff concedes that Sections 14(d) and (e) of the Williams Act grant the SEC
13 the authority to prescribe substantive rules and regulations regarding *disclosure of information*
14 necessary to protect shareholders of target companies in the takeover context. 15 U.S.C. § 78n.
15 However, there is no "serious conflict," because Section 1 of the Sherman Act is intended to enhance
16 *economic efficiency* by preventing collusive behavior "imposed by unreasonable restraint[s] on
17 competition." Business Elecs. Corp, 485 U.S. at 723; Rebel Oil Co., 51 F.3d at 1444 ("allocative
18 efficiency is synonymous with consumer welfare, and is the central goal of the Sherman Act")
19 (citation omitted).

20 Conversely, the Williams Act is intended to provide investors with the information necessary
21 to make an enlightened decision in responding to a tender offer. *See*, Rondeau v. Mosinee Paper
22 Corp., 422 U.S. 49, 58 (1975). The Williams Act is intended "solely to require full and fair
23 *disclosure* for the benefit of investors." Schreiber v. Burlington Northern, Inc., 472 U.S. 1, 9 (1985)

---

25 [7] Defendants' claim that the Credit Suisse decision has the sweeping effect of precluding
26 "application of the antitrust laws to the securities regime" (PE Mtn. at 18:6,) is patently overbroad.
27 Whether the antitrust laws are precluded requires a **case by case determination**. ("we must interpret
the securities laws as implicitly precluding the application of the antitrust laws *to the conduct alleged*
28 *in this case*"). Credit Suisse, 127 S.Ct. at 2387 (*emphasis added*).

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
ANTITRUST CLAIM
NO. 2:06-cv-01737-JLR                    16

FINKELSTEIN & KRINSK, LLP
501 WEST BROADWAY, SUITE 1250
SAN DIEGO, CA 92101
TELEPHONE: (619)238-1333

1    *citing*, 113 Cong. Rec. 24,644 (1967) (emphasis added). The Second Circuit, in Finnegan v.

2    Campeau Corp., also found that the Williams Act is of limited scope when it recognized that "the

3    SEC is *only empowered* to regulate in the area of disclosure." 915 F.2d 824, 831 (2d Cir. 1990)

4    (emphasis added).[8] *See also*, Schreiber, 472 U.S. at 6 (rejecting "petitioner's interpretation [which]

5    relies on the belief that Section 14(e) [of the Williams Act] is directed at purposes broader than

6    providing full and true information to investors.")

7        Manipulation of the tender offer price of stock by two collusive bidders is not within the

8    purview of the SEC's regulatory authority except to the extent that such manipulation involves a lack

9    of disclosure. 15 U.S.C. § 78n(e); 17 C.F.R. § 240.14e-3. Parties who, *devoid of any fraudulent*

10    *intent*, engage in an unreasonable restraint of trade in order to gain a competitive economic

11    advantage violate the Sherman act as much as they would if their intent were deceitful or misleading.

12    *See*, American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp., 456 U.S. 556, 573-74

13    (1982). Thus, the defendants' conclusion that the Williams Act's remedy of disclosure effectively

14    precludes application of the Sherman Act is erroneous.

15

16    **B.**      **THE ACQUISITION OF VOTING SECURITIES CONSTITUTES "TRADE OR COMMERCE" UNDER THE SHERMAN ACT**

17        Section 1 of the Sherman Act makes illegal unreasonable contracts, combinations and

18    conspiracies "in restraint of trade or commerce." 15 U.S.C. § 1. The Supreme Court has interpreted

19    "trade or commerce" in a very broad sense. In Philadelphia Nat'l Bank, *supra*, 374 U.S. at 368, the

20    Supreme Court applied the Sherman and Clayton Acts to "intangibles of credit and services." *See*

21    *also*, 374 U.S. at 340 ("Congress primarily sought to bring mergers within § 7 and thereby close

22    what it regarded as a loophole in [the Clayton Act]").

23

24

25    [8] The SEC is prohibited by Congress from expanding its interpretation of securities laws

26    when it imposes "a burden on competition not necessary or appropriate in furtherance of the

27    [Exchange Act]." 15 U.S.C. § 78s(f). This statutory limitation opens the door to the concurrent application of antitrust and securities laws when the two are not diametrically opposed. *See* Gordon,

28    422 U.S. at 682 ("clear repugnancy.")

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
ANTITRUST CLAIM
NO. 2:06-cv-01737-JLR           17

FINKELSTEIN & KRINSK, LLP
501 WEST BROADWAY, SUITE 1250
SAN DIEGO, CA 92101
TELEPHONE: (619)238-1333

1    It is important for the Court to note that Philadelphia Nat'l Bank was decided more than *two*

2    *decades after* the U.S. Supreme Court's decision in Apex Hosery Co. v. Leader, 310 U.S. 469 (1940)

3    – the case that the Private Equity Defendants heavily rely upon in their Motion (FP Def's Br., at p.

4    23) – addressed the issue of whether antitrust laws were applicable in the context of bank mergers.

5    374 U.S. at 323-324. The Court prefaced its analysis by noting the applicability of antitrust laws to

6    corporate acquisitions of stock and capital due to Congress' concern that the market for corporate

7    control would lead to monopolistic concentrations. *Id.*, at 337-38. Other Supreme Court cases have

8    made clear that the antitrust laws are applicable to agreements which purport to restrain the price of

9    commodities. *See*, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 222 (1940) ("[T]he

10   Sherman Act, so far as price-fixing agreements are concerned, establishes **one uniform rule**

11   **applicable to all industries alike**") (emphasis added). *See also*, Rothberg v. Nat'l Banner Corp.,

12   259 F.Supp. at 416 (attempt to corner market of single stock actionable under Section 1 of Sherman

13   Act).

14   If the Sherman Act were as narrow as the Private Equity Defendants suggest, the Supreme

15   Court would never reach the issue of which it has grappled so extensively: the coexistence of the

16   antitrust laws with other federal regulations governing the securities markets. *See e.g.*, Gordon v.

17   New York Stock Exchange, Inc., *supra*; United States v. Nat'l Ass'n of Sec. Dealers, Inc., 422 U.S.

18   694, 719-720 (1975); Silver v. New York Stock Exchange, *supra*. Accordingly, the Private Equity

19   Defendants World War II era argument, that has subsequently been rejected by Congress and the

20   U.S. Supreme Court, must similarly be rejected by this Court as a desperate attempt to distort the

21   issues.

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS
ANTITRUST CLAIM
NO. 2:06-cv-01737-JLR                                           18

FINKELSTEIN & KRINSK, LLP
501 WEST BROADWAY, SUITE 1250
SAN DIEGO, CA 92101
TELEPHONE: (619)238-1333

1

**VII.   CONCLUSION**

2

For the foregoing reasons, Plaintiff respectfully requests that the Private Equity Defendants'

3

motion to dismiss be denied in its entirety.

4

5

Dated:   October 12, 2007                                  Respectfully submitted,

6

**FINKELSTEIN & KRINSK LLP**

7

8

By:_____/s/ William R. Restis_____

9

Jeffrey R. Krinsk

10

Mark L. Knutson
501 West Broadway, Suite 1250
San Diego, CA 92101-3593

11

Tel:  (619) 238-1333
Fax: (619) 238-5425

12

Email: jrk@classactionlaw.com

13

Attorneys for Plaintiff

14

Pennsylvania Avenue Funds and the Class

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS                     FINKELSTEIN & KRINSK, LLP
ANTITRUST CLAIM                                                501 WEST BROADWAY, SUITE 1250
NO. 2:06-cv-01737-JLR                                          SAN DIEGO, CA 92101
                                          19                   TELEPHONE: (619)238-1333

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on this date, I electronically filed **PLAINTIFF'S OPPOSITION TO**

3 **DEFENDANTS FRANCISCO PARTNERS, L.P.,GLADIATOR CORPORATION,**

4 **FRANCISCO PARTNERS II, L.P., FRANCISCO PARTNERS PARALLEL FUND II, L.P.,**

5 **DAVID STANTON, DIPANJAN DEB, VECTOR CAPITAL CORPORATION, VECTOR**

6 **CAPITAL III, L.P., AND ALEXANDER R. SLUSKY'S MOTION TO DISMISS**

7 **PLAINTIFF'S ANTITRUST CLAIMS** with the Clerk of the Court using the CM/ECF system,

8 which will send notification of such filing to **Barry Kaplan, James N. Kramer, Eric D. Lowney,**

9 **Louis D. Peterson, Gabriel Z. Reynoso, Jeremy E. Roller, Michael R. Scott, Richard A. Smith,**

10 **and Michael D. Torpey** , and I hereby certify that I have mailed by United States Postal Service true

11 and correct copies of said documents to the following non CM/EFC participants:

| | |
|---|---|
| 12 **Counsel for Defendants Francisco Partners LP; Gladiator Corporation; Francisco Partners II, LP; Francisco Partners Paraller Fund II, LP; David Stanton; Dipanjan Deb** | **Counsel for Vector Capital Corporation; Vector Capital III, LP; and Alexander R. Slusky** |
| 15 David H. Evans<br>Email: evans.david@arentfox.com<br>16 James H. Hume<br>Deanne M. Ottaviano<br>17 Joshua Fowkes<br>Arent Fox LLP<br>18 1050 Connecticut Ave. NW<br>Washington, D.C. 20036-5339<br>19 Phone: 202.857.6493<br>Fax: 202.857.6395 | 14 Aravind Swaminathan<br>Email: aswaminathan@wsgr.com<br>Wilson Sonsini Goodrich & Rosati P.C.<br>701 5th Ave., Suite 5100<br>Seattle, WA 98104-7036<br>Phone: 206.883.2500<br>Fax: 206.883.2699<br><br>David J. Berger<br>Email: dberger@wsgr.com<br>Bahram Seyedin-Noor<br>Email: bnoor@wsgr.com<br>Wilson Sonsini Goodrich & Rosati P.C.<br>650 Page Mill Road<br>Palo Alto, CA 94304<br>Phone: 650.493.9300<br>Fax: 650.565.5100 |

23                                       Jonathan M. Jacobson<br>24                                     Email: jjacobsonr@wsgr.com<br>                                    Wilson Sonsini Goodrich & Rosati P.C.<br>                                    1301 Avenue of the Americas, 40th Flr.<br>25                                     New York, NY 10019<br>                                    Phone: 212.999.5800<br>26                                     Fax: 212.999.5899

27                                       Scott Andrew Sher<br>                                    Email: ssher@wsgr.com

28

| | |
|---|---|
| PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS<br>ANTITRUST CLAIM<br>NO. 2:06-cv-01737-JLR | FINKELSTEIN & KRINSK, LLP<br>501 WEST BROADWAY, SUITE 1250<br>SAN DIEGO, CA 92101<br>TELEPHONE: (619)238-1333 |

1
2

Wilson Sonsini Goodrich & Rosati P.C.
Two Fountain Square, Reston Town Center
11921 Freedom Drive, Suite 600
Reston, VA 20190

3

**Counsel for Edward J. Borey;**
4   **Steven N. Moore; Michael R.**
   **Kourey; Michael R. Hallman;**
5   **Richard A. LeFaivre; and**
   **William J. Schroeder**

6

Alan C. Smith
7   Email: asmith@orrick.com
   Orrick Herrington & Sutcliffe LLP
8   719 Second Avenue, Suite 900
   Seattle, WA 98104-7097
9   Phone: 206.839.4322
   Fax: 206.839.4301

10

Michael R. Scott
11   Email: idp@hcmp.com
   Hillis Clark Martin & Peterson, P.S.
12   1221 Second Avenue
   Seattle, WA 98101
13   Phone: 206.623.1745
   Fax: 206.623.7789

14

       I declare under penalty of perjury under the laws of the United States of America and the
15   State of Washington that the foregoing is true and correct. Dated this 12th day of October, 2007 at
   San Diego, California.

16

17                                         /s/ Andrea Vasquez
                                         Andrea Vasquez
18                                         Legal Assistant

19

20

21

22

23

24

25

26

27

28
   PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS          FINKELSTEIN & KRINSK, LLP
   ANTITRUST CLAIM                                      501 WEST BROADWAY, SUITE 1250
   NO. 2:06-cv-01737-JLR                                SAN DIEGO, CA 92101
                                          21            TELEPHONE: (619)238-1333