UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PENNSYLVANIA AVENUE FUNDS,

       Plaintiff,

    v.

EDWARD J. BOREY, et al.,

       Defendants.

CASE NO. C06-1737RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the court on three motions (Dkt. ## 119, 121, 122) to dismiss Plaintiff's second amended complaint ("Second Complaint").  Although the parties have requested oral argument, the court has already heard lengthy oral argument in resolving Defendants' motions to dismiss Plaintiff's first amended complaint ("First Complaint"), and finds that further oral argument would not be helpful.  The court resolves these motions based on the parties' briefing, the Second Complaint, and documents subject to judicial notice.  For the reasons stated herein, the court GRANTS all three motions to dismiss, and dismisses this action with prejudice and without leave to amend.  The clerk shall not enter judgment at this time, as the court will address Plaintiff's response to the court's September 23, 2008 order to show cause in a separate order.

ORDER – 1

## II. BACKGROUND

The parties should read this order in conjunction with the court's three February 2008 orders dismissing Plaintiff's First Complaint. Dkt. # 107 ("Securities Order"); Dkt. # 108 ("Fiduciary Duty Order"), Dkt. # 109 ("Antitrust Order"). Those orders granted Defendants' motions to dismiss, but gave Plaintiff limited leave to amend. Specifically, the court permitted Plaintiff to amend allegations that the directors of WatchGuard Technologies, Inc. ("WatchGuard") breached their fiduciary duties in conduct leading to the acquisition of WatchGuard in a going-private merger in October 2006. Antitrust Ord. at 13. The court also let Plaintiff amend insider trading allegations against "Vector," a collection of Defendants who competed for the right to acquire WatchGuard. *Id.*

In the Second Complaint, much has changed. The First Complaint alleged that WatchGuard's Board of Directors ("the Directors") acted more or less en masse in failing to appropriately auction off WatchGuard. Although certain allegations described fraudulent conduct by one or more Directors, most of the complaint was devoted to allegations of non-fraudulent breaches of duty. Fid. Duty Ord. at 4-5 (summarizing breach of fiduciary duty allegations). Now, Plaintiff alleges a thoroughgoing scheme to defraud WatchGuard's board and shareholders. At the center of the new fraud allegations is Edward Borey, WatchGuard's CEO and Chairman. Mr. Borey allegedly refused to consider any bid for WatchGuard that did not assure that he would continue as CEO of the post-merger company; he sabotaged suitors who would not offer him the interim CEO post, he lied to or withheld information from other Directors; he purged members of management who stood in the way of his scheme, and he destroyed evidence. The Second Complaint's vague allegations make it difficult to determine what the other Directors knew, but they breached their fiduciary duties either by lying to shareholders about the acquisition process, or by turning a blind eye to Mr. Borey's misconduct. ¶ 3[1] ("Other [D]irectors . . . turned a blind eye to the activities of Borey in conscious disregard

---

[1] The court cites the Second Complaint using bare "¶" symbols.

and abdication of their duties of loyalty and independence by ignoring the obvious signals and sources of information that indicated Borey was improperly conducting the sale of the Company."). Plaintiff also contends that "FP," a collection of corporate and individual Defendants who competed for the right to purchase WatchGuard, aided and abetted breaches of fiduciary duty by entering into a "secret deal" with Mr. Borey to provide him personal benefit in exchange for a favorable merger price. ¶¶ 2, 97. These allegations form the basis of Plaintiff's breach of fiduciary duty claim against the Directors and FP.

Plaintiff also contends that Vector traded on inside information in purchases of about 1.57 million shares of WatchGuard stock from March 14, 2006 to March 22, 2006. ¶¶ 53-54, 88. According to the Second Complaint, Vector acquired those shares while in possession of "confidential and proprietary information" about WatchGuard, and did so in violation of "customary non-disclosure and standstill agreements" it had entered with WatchGuard. ¶ 53.

The court reserves a detailed discussion of Plaintiff's allegations for its later analysis. The Directors and FP have moved to dismiss the breach of fiduciary duty claims against them. Vector has moved to dismiss the insider trading claims. The court now turns to each set of motions.

## III.  ANALYSIS

The court discussed the standards applicable to a motion to dismiss in its prior orders, and incorporates that discussion here. Briefly, the court must consider Plaintiff's allegations of fact and all plausible inferences arising from allegations of fact in the light most favorable to Plaintiff. The court will discuss heightened pleading requirements in the context of the allegations to which they apply. Generally, the court is limited to considering the complaint itself, but it may also consider documents to which the complaint refers so long as no one questions the authenticity of the document. *Marder v.*

*Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). The court may also consider evidence subject to judicial notice. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

Defendants have filed an omnibus Request for Judicial Notice ("RJN," Dkt. # 123). The court relies on documents included therein only in two circumstances. First, where Plaintiff's complaint relies on assertions about a specific written agreement, the court relies on the version of that agreement disclosed in SEC filings included in the RJN. Second, the court takes judicial notice of certain SEC filings. In doing so, the court does not accept the truth of any statement contained in the filings, but rather relies on them as uncontroverted evidence that the statements were disclosed to the public. The court has not relied on any documents in the RJN except those it cites in this order. The court notes that although Plaintiff objects to the RJN, it does not dispute the authenticity of any document.

**A.  Plaintiff's New Breach of Fiduciary Duty Allegations Do Not Comply with Fed. R. Civ. P. 9(b), and Thus Fail to State a Claim.**

**1.  The Court Considered and Dismissed the Breach of Fiduciary Allegations in the First Complaint.**

In the First Complaint, Plaintiff attributed WatchGuard's allegedly low merger price to the Board's failure to take steps during the acquisition process to maximize the value of the company. Fid. Duty Ord. at 4-5. With a few exceptions, these allegations did not amount to fraud or even bad faith, but rather to a less-than-zealous or even incompetent exercise of fiduciary responsibility to maximize the value of the company. *Id.* In addition, Plaintiff alleged conflicts of interests arising from benefits accruing to the Directors in the merger. *Id.* Only a few allegations sounded in fraud, such as allegations that the Directors intentionally withheld information about Vector's initial acquisition offer to help win shareholder ratification of a "poison pill," and that the Directors ultimately accepted the FP bid to hide unspecified "non-public information" that would have made them liable. *Id.* at 6 & n.3.

ORDER – 4

The court dismissed Plaintiff's original breach of fiduciary duty claims for two reasons. First, it held that the 8 Del. C. § 102(b)(7) liability-limiting clause in WatchGuard's articles of incorporation shielded the Directors from liability for any breach of their fiduciary duty of care. *Id.* at 10-11. Claims based on the Directors' negligence, even gross negligence, come under this shield. *Id.* Second, the court held that shareholder ratification of the WatchGuard merger was an independent defense to a breach of a duty of care, and a defense to Plaintiff's allegations that the Directors had breached their duties of loyalty and good faith. *Id.* at 11-16. The court held that Plaintiff could overcome shareholder ratification only by showing that WatchGuard's proxy disclosures contained material omissions or misrepresentations, or were coercive. *Id.* Absent one of those showings, Plaintiff could overcome ratification only by alleging that the merger was a waste of corporate assets. *Id.* at 16-17. The court held that there were no allegations giving rise to a plausible inference of material omissions or misrepresentations, a plausible inference of coercion, or a plausible inference of waste. *Id.* at 16-18. Finally, because there were no allegations that the Directors' conduct prevented consideration of competing bids to acquire WatchGuard, the court held that ratification obviated an application of enhanced "Revlon" judicial scrutiny of the Directors' conduct. *Id.* at 18-19.

If Plaintiff has sufficiently pleaded its new allegations in the Second Complaint, then the court would likely reach a different result than in the Fiduciary Duty Order. Since that order, Plaintiff has radically transformed its complaint, changing the focus from garden-variety breach of fiduciary responsibility allegations to new allegations of fraud pervading the acquisition process. Accepting the new allegations, the Directors would still bear no liability for negligent or grossly negligent conduct by virtue of the 8 Del. C. § 102(b)(7) liability-limiting clause. Ratification, however, would no longer serve as a defense, because the new allegations describe many fraudulent, material omissions or misrepresentations from the proxy statement. In essence, the Second

ORDER – 5

Complaint alleges that Mr. Borey hid material information about acquisition bids from shareholders, and did so while the other Directors either actively aided his fraud or impermissibly turned a blind eye toward it. In addition, the Second Complaint alleges that Mr. Borey's fraudulent behavior prevented WatchGuard from considering acquisition offers, which would give rise to enhanced "Revlon" scrutiny of the acquisition process.

### 2. The Second Complaint Makes Fraud the Focus of Plaintiff's Breach of Fiduciary Duty Claims.

Ultimately, the court concludes that the new allegations do not meet the heightened pleading standard of Fed. R. Civ. P. 9(b). Before explaining that conclusion, the court reviews the new allegations in detail.

### a. From the Outset of the Acquisition Process, Mr. Borey Insisted on Being Named Interim CEO of the Post-Acquisition Company.

Plaintiff's new allegations focus largely on the assertion that Mr. Borey refused to consider efforts to acquire WatchGuard unless the prospective acquirer agreed to name him the interim CEO of the post-acquisition company. Mr. Borey insisted from his first meeting with a potential acquirer that he be employed as "interim CEO" of the post-merger company. ¶ 26. This first meeting took place between Mr. Borey, WatchGuard General Counsel Mike Piraino, and Vector representatives in late March 2005. ¶¶ 25-27. Plaintiff alleges that the Directors' description of this meeting in the merger proxy was "incomplete, inaccurate and misleading," but does not explain its allegation. ¶ 25. This meeting "stalled" because Defendant Alexander Slusky, Vector's principal, refused to promise Mr. Borey the interim CEO post, and insisted that he be able to present acquisition offers to the other Directors. ¶ 26. There is no allegation that Vector made a formal acquisition offer at this early meeting. There is also no allegation that would explain how Mr. Borey prevented Vector from expressing its interest to the other Directors. Nonetheless, the Second Complaint alleges that Mr. Borey "intentionally did not disclose Vector's interest to the Board," his first fraudulent omission. ¶ 34. Mr.

ORDER – 6

Borey allegedly kept Vector's interest secret so that he could revamp his compensation to increase his personal benefit in a change of control. ¶¶ 28, 34.

### b. Mr. Borey Revises His Compensation to Benefit Him in Any Acquisition of WatchGuard.

As of the March 2005 meeting, Mr. Borey was subject to a compensation agreement that took effect when WatchGuard hired him on June 30, 2004. ¶ 27; RJN, Ex. K. In relevant part, it awarded Mr. Borey one million WatchGuard stock options, of which one quarter would vest one year later, and the remainder would vest in equal monthly increments until all options vested four years later. RJN, Ex. K ¶ 3. In the event that Mr. Borey lost his job through a qualifying corporate transaction (like a sale or merger of the company), vesting would accelerate by 24 months from the date of his termination. *Id.* ¶¶ 3, 9. He would also receive a lump-sum payment equal to twice his annual salary. *Id.* ¶ 9.

According to the Second Complaint, Mr. Borey directed changes in his compensation shortly after his initial meeting with Vector, believing that an acquisition of WatchGuard was imminent. ¶¶ 28-32. Mr. Borey presented the changes to the other Directors. ¶ 34. The Directors approved the changes and disclosed them in two April 2005 SEC filings. ¶ 35. Those filings disclose two compensation changes, which the Second Complaint describes as an Enhanced Severance Agreement ("ESA") and "Option Regrant." ¶ 35; RJN, Ex. L (describing ESA and Option Regrant), Ex. M (describing Option Regrant).

The Option Regrant was open to all WatchGuard employees with options whose exercise price was more than $6 per share. RJN, Ex. M. At the time, WatchGuard stock was trading well below $6. ¶ 28. The Regrant gave option holders the right to exchange their options for options with an exercise price at the then-current trading price, at an exchange ratio determined by the exercise price of the original options. RJN, Ex. M. The new options would vest under the same schedule as the original options. *Id.* Mr.

ORDER – 7

Borey took advantage of the Option Regrant in May 2005, exchanging one million options with an exercise price of $7.21 for 900,000 options with an exercise price of $3.45. ¶ 40.

The ESA replaced Mr. Borey's June 2004 compensation package. RJN, Ex. L. It did not raise Mr. Borey's salary. *Id.* Instead, it eliminated the two-year accelerated vesting that the previous package provided, and replaced it with complete vesting of *all* stock options in the event that Mr. Borey lost his job within 18 months of a qualifying corporate transaction. *Id.* It also provided him proportional payment of his annual bonus target, depending on how much of the year he had worked when his termination occurred. *Id.* At the same time that the Directors approved the ESA, they approved severance packages for other officers in which they would receive one year's salary in the event they lost their jobs within 18 months of a qualifying corporate transaction. *Id.* (attaching "Change in Control Severance Agreement [For Executives Other than CEO/CFO]") (bracketed material in original).

The ESA and Option Regrant assured that Mr. Borey stood to gain substantially from an acquisition of WatchGuard.[2] Indeed, the Complaint alleges that Mr. Borey proposed the Regrant and the ESA for his own benefit. ¶ 28, ¶ 32 ("Borey instructed Piraino to have the Option Regrant drafted in a manner particularly beneficial to his interests but to attempt to disguise this objective."), ¶ 34 (alleging that ESA and Regrant were "intended to enrich Borey in a change of control transaction that he recognized was imminent"). He would become fully vested in at least 900,000 WatchGuard options at an exercise price of $3.45. He would receive a substantial payment. Most importantly, for

---

[2] The court notes that Plaintiff cannot challenge the ESA or Option Regrant as a breach of anyone's fiduciary duty. Claims for excessive executive compensation must be brought derivatively, even where they precede a change of control transaction. *Kramer v. Western Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) (holding that claims of "payment of unnecessary options, bonuses, fees, and expenses" before a merger can be remedied only in a derivative claim for corporate waste). Plaintiff asserts no derivative claims, nor could it, because it lost standing to assert derivative claims when the WatchGuard merger extinguished its shares. *Id.* at 354 (citing continuous shareholder ownership rule of *Lewis v. Anderson*, 477 A.2d 1040 (Del. 1984)).

ORDER – 8

purposes of this order, he would receive these benefits in *any* change of control transaction. Thus, Mr. Borey had every incentive to maximize the acquisition price of WatchGuard. Every penny of increase in the share price of the acquisition would benefit him $9000 from the exercise of his stock options alone, and more from his other stock holdings. *See* Fid. Duty Ord. at 8 (noting that Directors collectively owned 5.8% of WatchGuard stock before accounting for stock options). The other Directors were also substantial stockholders, and similarly stood to benefit from any increase in the acquisition price. *Id.*

These guaranteed change-of-control benefits make Mr. Borey's alleged insistence on being employed as "interim CEO" a curious proposition, to say the least. Plaintiff never describes what benefits would accrue to Mr. Borey as a result of being employed as the interim CEO. This omission is significant, because the Second Complaint alleges that Mr. Borey's obsession with the "interim CEO" post caused him to depress the acquisition price of WatchGuard by a minimum of 85 cents per share, at a personal cost to him of more than $750,000. Plaintiff's description of Mr. Borey's costly sabotage of the bidding process follows.

        **c.**    **Mr. Borey Sabotages the Acquisition Process by Thwarting Suitors Who Would Not Agree to Name Him Interim CEO.**

Plaintiff contends that at about the same time that WatchGuard approved the ESA and Option Regrant, Mr. Borey continued to refuse to let Vector speak to the other Directors without agreeing to appoint him "interim CEO." ¶ 36. Concerned that Vector would attempt a hostile takeover of WatchGuard, Mr. Borey prepared a "poison pill" shareholder rights plan to protect against that contingency. ¶¶ 37-38; Fid. Duty Ord. at 2 (describing poison pill), 7-8 (concluding that adopting poison pill was not a breach of fiduciary duty). The poison pill would take effect only after a third party acquired more than 15% of WatchGuard's stock on the open market. First Request for Judicial Notice (Dkt. # 72), Ex. D. WatchGuard disclosed the adoption of the poison pill and its terms in

ORDER – 9

a May 2005 SEC filing. *Id.*; ¶ 39. The Second Complaint does not disclose how Mr. Borey was able to simultaneously hide Vector's interest in acquiring WatchGuard from the other Directors while convincing them to adopt a poison pill that was of value only in the event of an unapproved attempt to acquire the company.

The Second Complaint alleges that WatchGuard's SEC filing disclosing the adoption of the poison pill falsely stated that "WatchGuard is not currently aware of any attempts to acquire control of the company." ¶ 39. This statement would appear to be true, as there is no allegation that Vector had attempted to acquire WatchGuard at that time, as opposed to merely expressing interest in an acquisition. If the Directors' public statement was false, the Second Complaint does not explain why it was false.

After the adoption of the poison pill, WatchGuard began to search for prospective acquirers or partners. This led Mr. Borey to speak with numerous companies and private equity funds. ¶ 42 (describing at least 15 suitors). According to the Second Complaint, Mr. Borey insisted to each interested party that he be retained as interim CEO. *Id.* No one except FP expressed an interest in acceding to Mr. Borey's demand. ¶ 43. Mr. Borey "hermetically sealed" his meetings with the suitors, and falsely reported his discussions at those meetings to the other Directors. ¶ 44 (alleging that Mr. Borey either "sterilized the information presented to the Directors or did not report the content of meetings"). The Second Complaint fails to allege what Borey said or did to ensure that the other Directors remained in the dark, other than an allegation that Mr. Borey fired at least four WatchGuard officers, including its Chief Financial Officer, because they had "too much knowledge and/or object[ed] to Borey's practices." ¶ 47 n.4. According to the Second Complaint, all suitors except FP and Vector were "driven off" by Mr. Borey's sabotage. ¶ 43.

The other Directors refused to take a more active role in the acquisition process, allowing Mr. Borey to conduct all negotiations. ¶¶ 45-46. When Mr. Borey met with investment banks in September 2005 for assistance in the search for an acquirer or

ORDER – 10

partner, the other Directors took no role. ¶ 47. The Second Complaint is either vague or silent as to whether the other Directors' inaction was because Mr. Borey lied about or withheld information that would have caused them to act, because the Directors were complicit with Mr. Borey because they knew (or should have known) of his misconduct. The Second Complaint also fails to address the other Directors' WatchGuard stock holdings, which would have provided them with substantial incentive to maximize the acquisition price of the company.

By February 2006, Vector circumvented Mr. Borey and sent a letter directly to the full board. ¶ 49. The Second Complaint does not explain why Vector could not have done so sooner. In a February 17 letter, Vector expressed its interest in an all-cash merger or tender offer, expressed concern that it was not being included in a rumored search for acquirers, and demanded a meeting with the board. *Id.* Despite the Second Complaint's allegation that Mr. Borey had prevented Vector from making a bid beginning in March 2005, Vector's letter does not contain even a hint that it had previously attempted to make an offer for WatchGuard. ¶ 49 (quoting letter); RJN, Ex. H (disclosure of letter in SEC filing). Mr. Borey and Mr. Piraino allegedly intercepted the letter at a WatchGuard fax machine and hid it from the other Directors. ¶ 51. They also declined to disclose the offer to WatchGuard's shareholders, believing it would cause the shareholders to vote against the poison pill. ¶ 56. Instead, Mr. Borey met with Vector in the week of March 13, 2006. ¶ 52; RJN, Ex. H. Vector also met with Mr. Borey and "several of WatchGuard's executive vice presidents" a week after Vector sent the letter. *Id.* Whatever efforts Mr. Borey made to keep Vector's letter from the other Directors, it became a matter of public record when Vector included it as an exhibit to an SEC filing on March 23, 2006. ¶ 55. According to the Second Complaint, this only strengthened Mr. Borey's opposition to any transaction with Vector. ¶ 58.

FP and Vector submitted competing bids within days of each other in late May 2006. FP's offer came first, a conditional bid of $5.00 per share. ¶ 65. Vector's offer

ORDER – 11

had no financing contingencies, was for $5.10 per share, and was conditioned only on completing due diligence. ¶ 66; RJN, Ex. I (May 31 SEC filing from Vector disclosing $5.10 bid). Mr. Borey nonetheless insisted that he would not support the Vector offer unless it included assurance that he would be the interim CEO. ¶ 67. The Second Complaint strangely alleges that the Directors breached their duties by not "publicizing" Vector's $5.10 bid to create a "floor" for bidding. ¶ 68. Vector publicized the bid in an SEC filing within days of making it (RJN, Ex. I), raising the question of what additional publicity Plaintiff would have required from the Directors.

### d. Mr. Borey Enters a Secret Agreement with FP to Support Its Lower Offers To Acquire WatchGuard in Exchange for the Interim CEO Post.

Although the Vector offer was for more money, Mr. Borey reached an agreement with FP to support its bid in exchange for naming him as interim CEO. ¶ 70. Because it had "purchased the support of Borey," FP lowered its bid to $4.60 per share. ¶ 71. Mr. Borey did not disclose his agreement with FP to the Directors or WatchGuard shareholders. ¶ 73. Thus, when the other Directors contacted Vector and FP to attempt to negotiate a bid in excess of $5 per share, it was a "valueless" exercise. ¶ 73, ¶ 74 (alleging that Mr. Borey told FP that it did not need to increase its bid unless Vector did so, because he "controlled the Directors").

In late June 2006, Vector responded to FP's bid by submitting a $4.65 per share bid, ¶ 72, and publicly disclosing it in a June 28 SEC filing. RJN, Ex. J. The bid was again contingent on additional due diligence. *Id.*

FP responded on July 18 with a $4.25 per share bid that would expire in three days. ¶ 75. Vector continued to express its interest in acquiring WatchGuard, and was informed that the FP transaction was imminent. ¶ 76. Mr. Borey secretly directed his representatives to provide Vector with a draft merger agreement that provided that he would be retained as interim CEO. *Id.* The Second Complaint does not reveal whether Vector agreed to this provision, but it did state its intent to submit a bid at a "substantial

ORDER – 12

premium" to WatchGuard's market price. ¶ 77. Committing fraud again, the Directors falsely stated in the merger proxy that Vector's final effort had come after they had voted in favor of the FP transaction, when in actuality it had come before the vote. ¶ 77.

WatchGuard announced the acceptance of FP's bid on July 25, 2006. ¶ 78. Although the merger agreement contained a "fiduciary out" clause that permitted the Directors to exercise their fiduciary duty to consider a superior competing bid, there is no allegation that anyone made a superior bid. There are also no allegations that Mr. Borey continued his campaign to sabotage competing bids.

Shareholders ultimately approved the WatchGuard merger, which closed in early October 2006. Shareholders never knew about Mr. Borey's secret agreement with FP to be retained as interim CEO, because the proxy did not disclose it. ¶ 81. The merger proxy disclosed that Mr. Borey would be retained as interim CEO of the post-merger company[3], despite the Second Complaint's mistaken allegations to the contrary. ¶ 81.

Punctuating the fraudulent scheme, Mr. Piraino "destroy[ed] key documents concerning Borey and Piraino's secret deal with FP, as well as other documents concerning the process leading up to the Acquisition." ¶ 86. The Second Complaint alleges, albeit with no additional detail, that Mr. Borey was complicit in the destruction of the documents. ¶ 3. The Second Complaint contains no allegations about the content of the documents. The court notes, moreover, that Mr. Piraino is not a defendant.

### 3. Plaintiff's Allegations of Fraud Do Not Comply With Rule 9(b).

Most of Plaintiff's new allegations are averments of fraud. Most of them target Mr. Borey: he intentionally failed to disclose his first meetings with Vector to the other

---

[3] The Second Complaint alleges falsity in this statement in the merger proxy: "The directors and officers of Warrior immediately prior to the merger will become the directors and officers of the surviving corporation following the merger." ¶ 81 (quoting RJN, Ex. A at 59). This statement is allegedly false because it does not disclose that Mr. Borey would become CEO of the post-merger company. Plaintiff is simply mistaken. The proxy disclosed that the Directors of WatchGuard would resign at the time of the merger to be replaced by directors of FP's merger subsidiary, Warrior. RJN, Ex. A at A-3. The *officers* of WatchGuard, by contrast, would remain as officers of the merger subsidiary. *Id.* Thus, the proxy discloses that the post-merger company would have FP-appointed directors and WatchGuard's officers, including Mr. Borey as CEO.

ORDER – 13

Directors so that he could pursue personal benefits; he either misrepresented to the other Directors the contents of his meetings with suitors or simply refused to tell them about the meetings; he intercepted Vector's February 17 letter to the Board, disclosing it neither to other Directors nor shareholders; and he did not disclose that his support of FP's bids had been "purchased" with a secret agreement to retain him as interim CEO. Some allegations target false representations by the Directors as a whole: they lied in the merger proxy about Vector's first expression of interest in acquiring WatchGuard; they lied in announcing the poison pill by stating that they were not aware of current attempts to acquire the company; they failed to disclose in the merger proxy the material benefits that Mr. Borey was receiving from FP; and they lied when they stated that Vector's final offer had come after they had voted on the FP bid, rather than before the vote. The allegation that Mr. Piraino and Mr. Borey destroyed unspecified "key" documents is an allegation of a fraudulent cover-up. Any of these allegations describe fraud under Delaware law, Washington law, or federal securities laws.

Even though Plaintiff has not pleaded a cause of action for fraud, or any cause of action of which fraud is an element, averments of fraud are subject to Rule 9(b). *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1005 (9th Cir. 2003). Rule 9(b) serves at least two functions. First, it ensures that allegations of fraud are particularized enough to give a defendant notice of specific misconduct, so that he can defend himself with more than a blanket denial of wrongdoing. *Id.* at 1106. Second, it shields both defendants and courts from plaintiffs who might use unsubstantiated allegations of fraud as a "pretext for the discovery of unknown wrongs." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985); *see also Anderson v. Clow (In re Stac Secs. Litig.)*, 89 F.3d 1399, 1405 (9th Cir. 1996) (citing *Semegen*); *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001) (citing *Stac*). In part, Rule 9(b) helps weed out false or unsubstantiated allegations of fraud, with their attendant damage to the defendant's reputation, from legitimate accusations. *Bly-Magee*, 236 F.3d at 1018. It also helps stop a plaintiff from "unilaterally imposing upon

ORDER – 14

the court, the parties and society enormous social and economic costs absent some factual basis." *Semegen*, 780 F.2d at 731. In a case like this one, where discovery is frozen pending the outcome of a motion to dismiss, allowing fraud allegations that do not satisfy Rule 9(b) would "promote settlement based on the anticipated litigation expense," rather than the merits of the claim. *See McHenry v. Renne*, 84 F.3d 1172, 1178 (9th Cir. 1996).

Plaintiff's fraud allegations do not satisfy Rule 9(b). To do so, they would have to "state with particularity the circumstances constituting fraud," except for the defendant's mental state. Fed. R. Civ. P. 9(b). A plaintiff must buttress fraud allegations with "the who, what, when, where, and how" of the fraud. *Vess*, 317 F.3d at 1106 (citation omitted); *see also Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) ("The complaint must specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity."). Where specificity depends on information uniquely in the hands of a defendant, a plaintiff may satisfy Rule 9(b) with allegations based on "information and belief," but must "state the factual basis for the belief." *Neubronner*, 6 F.3d at 672.

Despite Rule 9(b)'s requirements, Plaintiff's fraud allegations raise more questions than they answer. Who committed fraud? Mr. Borey is an obvious culprit, but where the other Directors are involved, it is rarely clear whether they are alleged to have known that they were deceiving shareholders. For example, the complaint targets many false statements in the merger proxy, but does not explain whether Directors other than Mr. Borey were aware that the statements were false when made.

What benefits did Mr. Borey or the other Directors hope to derive from the fraud? If Mr. Borey did what Plaintiffs allege, he cost himself at least $765,000, the difference between the value of his 900,000 stock options at Vector's initial $5.10 bid and the $4.25 bid from FP that WatchGuard ultimately accepted. He would not do so unless the "interim CEO" post he desired was worth at least that much. Yet the Second Complaint is wholly silent as to the benefits Mr. Borey was to receive as "interim CEO" or any

ORDER – 15

information about that post, including how long he would occupy it.[4]  What about the interim CEO post made it valuable enough that Mr. Borey give up at least $765,000?  Similarly, to the extent that the other Directors' conduct is alleged to be fraudulent, why would they participate in a fraud that cost them hundreds of thousands of dollars?

To the extent that the interim CEO post merely perpetuated Mr. Borey's existing compensation package, those benefits were publicly disclosed, as was the fact that Mr. Borey would be the interim CEO of the post-merger company.  *See supra* n.3.  Thus, unless the interim CEO post came with material benefits that the proxy did not disclose, shareholders ratified Mr. Borey's retention as interim CEO after full disclosure.  The Second Complaint is silent as to any benefit accruing to Mr. Borey as interim CEO.  For that reason, allegations of breach of the duty of loyalty based solely on Mr. Borey's retention as CEO are extinguished by ratification.

For the same reasons, allegations of fraud against FP based on its agreement to "purchase" Mr. Borey's acquiescence in sharply decreased bids are deficient as well.  Absent some allegation that FP offered Mr. Borey a reward that would make him forego at least $765,000 for his WatchGuard stock, the allegations of fraud against FP lack particularity.

How did Mr. Borey perpetrate the fraud?  In particular, how was he able to keep sophisticated suitors with hundreds of millions of dollars for a potential acquisition of WatchGuard from communicating with other Directors?  If Mr. Borey insisted on remaining entrenched as CEO, why did those entities not make direct contact with other Directors?  Why did they not use corporate media to publicize Mr. Borey's self-dealing?  They were capable of doing so, as the Second Complaint describes several instances in which would-be acquirers publicized their concerns about the WatchGuard acquisition

---

[4] Defendants requested that the court take judicial notice of Mr. Borey's termination agreement, which he, WatchGuard, and WatchGuard's post-merger parent company executed on October 4, 2006, just before the merger closed.  RJN, Ex. O.  That contract is not a proper subject of judicial notice, and Defendants' contention that the Second Complaint relies on the agreement is erroneous.  ¶ 81 (describing interim CEO agreement existing as of September 1, 2006).

ORDER – 16

process. *E.g.*, ¶¶ 49, 61. After the Directors voted to approve a merger, how did Mr. Borey continue to prevent interested suitors from making topping bids in the more than two months between the vote and the closing of the merger?[5] Although Mr. Borey intercepted Vector's February 17, 2006 letter to the Board, the other Directors clearly became aware of it at some point. When?

Why are some of the statements that the Directors made false? Plaintiff alleges that the merger proxy's description of Vector's first contact with WatchGuard was "incomplete, inaccurate, and misleading." ¶ 26. Plaintiff does not explain this allegation, and the court has no basis to conclude that it was materially inaccurate. Similarly, the Directors' statement that they were unaware of any attempt to acquire WatchGuard when they approved the poison pill appears, based on all allegations in the complaint, to be true, but Plaintiff alleges without corroborating detail that it is "deceptive, false, and misleading." ¶ 39. Plaintiff alleges that the Directors falsely stated in the merger proxy that Vector sent an e-mail about a revised bid after the Board had voted to approve the FP bid. ¶ 77. Vector alleges that this is false because Vector had received an "overture" before the vote. *Id.* Yet the proxy discloses that the afternoon before the Directors' evening vote, Vector had not yet submitted a "definitive proposal." RJN, Ex. A at 30. If that statement is false, *i.e.* if Vector made a "definitive proposal" before the Director's vote, Plaintiff must describe the definitive proposal with particularity.

What was the content of the fraudulent misrepresentations and omissions? Plaintiff's allegations that Mr. Borey "sanitized" his communications with the other

---

[5] In the Fiduciary Duty Order, the court described various deal protection devices in the merger agreement, including a "no-shop" provision, an agreement that the Directors would vote their shares in favor of the merger, and a $6 million termination fee. Fid. Duty Ord. at 18-19. The court also noted, however, that the poison pill expired in early 2006, and the merger agreement contained a "fiduciary out" clause that permitted the Directors to exercise their fiduciary duties to consider superior bids. *Id.* The only barrier that the protection devices erected was an implicit requirement that a rival bidder top FP's bid by 17 cents per share to overcome the termination fee. *Id.* at 19. Vector made two bids that exceeded FP's $4.25 bid by 40 cents and 85 cents, respectively. The deal protection devices did not prevent Vector from making those bids after the Directors approved the merger.

ORDER – 17

Directors about the acquisition process do not permit anyone to understand what he revealed, what he omitted, or what he lied about. What "key" documents did Mr. Piraino destroy, and what did Mr. Borey tell him to destroy?

Plaintiff's allegations suffer rather than benefit from reliance on information acquired from two "confidential witnesses." The confidential witnesses ("CWs") were WatchGuard vice-presidents who allegedly observed many of the events giving rise to the new allegations. ¶ 26 n.1 (describing CW1 as "intimately involved in the acquisition process"), ¶ 42 n.2 ("CW2's involvement in the acquisition process consisted of presenting information about WatchGuard to potential suitors"). Despite their intimate involvement with the acquisition process, the CWs offer little detail. CW1 witnessed Mr. Piraino's destruction of "key documents concerning Borey and Piraino's secret deal with FP, as well as other documents concerning the process leading up to the Acquisition." ¶ 86. But CW1 provides no information at all about the content of the documents, and no allegations detailing Mr. Borey's involvement in their destruction. CW1 allegedly had sufficient inside access to know that Vector made a bid just before the Directors' vote, ¶ 77, but he offers no information about that bid. CW1 witnessed Mr. Borey in meetings where he insisted to suitors that he be retained as interim CEO, ¶ 42, but offers no details about what Mr. Borey said. Plaintiff is not obligated to rely on confidential witnesses when making allegations of fraud, but in doing so, it weakens its ability to claim that information about that fraud is uniquely in the hands of Defendants. *See Neubronner*, 6 F.3d at 672 (describing "relaxed version" of Rule 9(b) that applies to information exclusively within defendant's control). Plaintiff's reliance on insider witnesses merely highlights its failure to plead fraud with particularity.

### 4. Stripped of Insufficiently Particular Allegations of Fraud, the Second Complaint Does Not State a Breach of Fiduciary Duty Claim.

Plaintiff's failure to plead allegations of fraud with particularity is also fatal to its allegations of non-fraudulent misconduct. Not all of Plaintiff's new allegations describe

ORDER – 18

fraud, and the court has already noted that the First Complaint was mostly based on allegations of non-fraudulent conduct. Fid. Duty Ord. at 6 n.3. When considering the Second Complaint, the court must disregard all allegations of fraudulent conduct and strip them from the complaint. *Vess*, 317 F.3d at 1105. Stripped of allegations of fraudulent conduct, the Second Complaint consists of three categories of allegations: allegations of breach of fiduciary duty that the court already rejected in dismissing the First Complaint, allegations that Mr. Borey attempted to secure personal benefits in negotiation acquisitions (and that FP aided and abetted the attempt), and allegations that the other Directors abdicated their fiduciary duties. The latter two categories, however, consist of allegations that are either non-actionable or nonsensical without accompanying allegations of fraud. When allegations of Mr. Borey's fraudulent agreement with FP are stripped from the Second Complaint, his entrenchment in the interim CEO post was disclosed to the shareholders in the merger proxy and thus ratified by their vote to approve the merger. FP's decision to offer him the post is similarly ratified. When allegations of Mr. Borey's fraudulent misrepresentations and omissions to the other Directors are stripped from the Complaint, the other Directors have done no more than they were alleged to have done in the First Complaint. The court already rejected those allegations as the basis of a breach of fiduciary duty claim.

For these reasons, the court dismisses the Second Complaint's breach of fiduciary duty claims. This dismissal makes it unnecessary for the court to address Plaintiff's claims that Vector and FP[6] are liable as WatchGuard's successor companies.

---

[6] Among the changes in the Second Complaint was an assertion that Vector and FP are successors to WatchGuard, at least in part because they agreed to indemnify the Directors. Even assuming that Vector and FP were somehow successors to WatchGuard, WatchGuard itself is not a Defendant in this action. Moreover, Plaintiff cites no authority for the proposition that an agreement to indemnify the Directors somehow converts FP and Vector into co-Defendants. The court declines to address these issues in further detail only because its disposition today does not require it to do so.

ORDER – 19

**B.      Plaintiff's Insider Trading Allegations Fail to Establish Standing or Raise a Strong Inference of Scienter.**

Plaintiff alleges that Vector purchased at least 1.57 million shares of WatchGuard while in possession of confidential information, in violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), Rule 10b-5 (17 C.F.R. § 240.10b-5). According to Plaintiff, Vector purchased those shares from March 14, 2006 to March 22, 2006, while in possession of material non-public information. ¶¶ 54, 88.

When the court dismissed the First Complaint's insider trading allegations against Vector, it noted that the allegations were subject both to the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Securities Ord. at 6. Plaintiff's allegations were deficient for three reasons. First, Plaintiff's contradictory allegations left much doubt as to whether the First Complaint alleged that Vector had material non-public information when it bought the shares. *Id.* at 6-7. Second, the allegations admitted that Vector had not entered an agreement with WatchGuard not to disclose or trade on the information until after Vector bought the shares. *Id.* at 7-8. That admission was fatal, because Plaintiff relied on the "misappropriation theory" of insider trading, which requires a non-insider defendant to trade on non-public information in violation of a legal duty to the source of that information. *Id.* at 5 (describing "classical" and "misappropriation" theories of insider trading). Vector's obligation to WatchGuard arose, if at all, from an agreement prohibiting the use of information it acquired during due diligence. Absent allegations that Vector entered such an agreement *before* making the challenged trades, it could not be liable. Third, the court found that the First Complaint fell short of satisfying the PSLRA's requirement that its allegations give rise to a strong inference that Vector acted with scienter. *Id.* at 8.

Plaintiff cured the first two problems in its Second Complaint. It alleged that Vector acquired material non-public information from WatchGuard just prior to March

14, 2006 in the course of due diligence before making an acquisition offer. ¶ 53. Vector also executed "customary nondisclosure and standstill agreements" before receiving the information on or about March 13, 2006. *Id.* Plaintiff's new allegations, however, do nothing to cure its failure to state allegations giving rise to a strong inference of scienter. Moreover, they reveal another problem: Plaintiff lacks standing to sue for insider trading.

Before addressing scienter and standing, the court notes that describing Plaintiff's insider trading allegations is no easy task. In its September 23, 2008 order to show cause, the court detailed the "confounding pleading" style that characterized the allegations of insider trading in the First Complaint. Dkt. # 138 at 5. Despite plain warning from the court and Defendants, Plaintiff repeated the same "logically and factually [in]consistent" allegations in the Second Complaint. *Id.* at 8. The court issued its order to show cause in part because the allegations gave rise to an inference that "Plaintiff has deliberately used obfuscatory pleadings for the purpose of making it difficult to attack those pleadings in a motion to dismiss." *Id.* at 9. In response to the order to show cause, Plaintiff clarified its insider trading allegations. The court relies on Plaintiff's response to the order to show cause, as well as clarifying statements in Plaintiff's opposition to Vector's motion to dismiss, to assess the insider trading allegations. For purposes of addressing standing, the critical admission in these pleadings is that Vector *bought* 1.57 million shares of WatchGuard while in possession of material non-public information, and that only persons who *sold* shares contemporaneously with Vector have standing to sue.

Courts require a private plaintiff seeking damages for insider trading to have traded contemporaneously with the defendant. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1001 (9th Cir. 2002) ("The contemporaneous trading requirement . . . is a[] judicially-created standing requirement, specifying that to bring an insider trading claim, the plaintiff must have traded in a company's stock at about the same time as the alleged

insider.").[7]  Moreover, a plaintiff must plead contemporaneous trading in a manner that satisfies Rule 9(b)'s particularity requirement.  *Neubronner*, 6 F.3d at 670.

Plaintiff has no standing to sue for insider trading.  Not only does it fail to allege contemporaneous trading with particularity, it fails to allege that it traded at all.  The only allegation pertaining to Plaintiff's stock ownership is that it held 10,000 WatchGuard shares at the time of the merger.  ¶ 11.  Rather than alleging that it traded contemporaneously with Vector, Plaintiff alleges that other WatchGuard shareholders traded contemporaneously with Vector.  ¶ 88.  Plaintiff's desire to represent those shareholders in a class or subclass is of no consequence.  As of now, there is no class or subclass, and thus no allegation that any party to this litigation traded contemporaneously with Vector.  Plaintiff's contention that the court should not address its lack of standing until the class certification stage is unsupported by any legal authority.[8]

The court notes, moreover, that while the contemporaneous trading requirement is a question of statutory standing, a plaintiff that does not trade at all likely lacks standing under either constitutional or prudential standing principles.  Courts often struggle with the question of how close in time a trade must be to an insider's trade to be contemporaneous.  *E.g.*, *Neubronner*, 6 F.3d at 670 (noting lack of clear "borderline" in contemporaneous trading rule).  But where the plaintiff alleges no trades at all, deeper questions of standing arise.  How does one claim an "injury in fact" that satisfies Article III of the Constitution when one does not claim to have suffered an injury at all?  *See*

---

[7] The contemporaneous trading requirement applies not only to Plaintiff's Section 10(b) and Rule 10b-5 claims, but also to its derivative claim under Section 20A of the Exchange Act (15 U.S.C. § 78t-1(a)).  *In re Verifone Secs. Litig.*, 784 F. Supp. 1471, 1488 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993).

[8] Plaintiff cites *Hevesi v. Citigroup, Inc.*, 366 F3d 70, 82 (2d Cir. 2004).  There, the court merely noted that a "lead plaintiff" in an action subject to the PSLRA need not have standing to pursue every claim of every class member.  *Id.*  Unlike Plaintiff, the lead plaintiff in *Hevesi* had co-plaintiffs with standing to pursue those claims.  *Id.* (noting "named plaintiffs who have standing to bring the additional claims" even though they had not been "vetted under the PSLRA").  Plaintiff similarly mis-cites *In re Lantronix*, No. CV02-3899PA(JTLX), 2003 WL 23198818 (C.D. Cal. Dec. 31, 2003).  There, the lead plaintiff sought to add a co-plaintiff with standing to bring all claims.  *Id.* at *11-12.  There is no co-plaintiff with standing in this action.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (discussing injury requirement for Article III standing). Similarly, prudential standing rules require plaintiffs to "assert their own rights rather than rely on the rights or interests of third parties." *Hong Kong Supermarket v. Kizer*, 830 F.2d 1078, 1081 (9th Cir. 1987). Where Plaintiff pleads no injury to itself, the court questions whether it has subject matter jurisdiction to address the insider trading claim. *See, e.g.*, *Ar v. Hawaii*, 314 F.3d 1091, 1097 (9th Cir. 2002) (noting that Article III standing is the cornerstone of a federal court's subject matter jurisdiction).

Although Plaintiff has not pleaded statutory standing, and may lack constitutional or prudential standing, the court will also address its failure to plead scienter. The court does so because Plaintiff suggests it can cure any standing defects merely by amending its complaint to add a plaintiff with standing. Dkt. # 126 at 19-20.

Plaintiff's allegations do not create a strong inference of scienter on Vector's part, as the PSLRA requires. First, the Second Complaint fails to allege what information Vector acquired before purchasing 1.57 million shares from March 14 to March 22, other than to generically allege that it was material and non-public. Absent such detail, there is little reason to infer that Vector acted with either intent to deceive or deliberate recklessness akin to intentional deception when it traded. *See Metzler Investment GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1066 (9th Cir. 2008) (defining scienter). Second, the Second Complaint fails to address that if Vector had entered a standstill agreement on March 13 in which it promised not to purchase additional WatchGuard shares after learning information in due diligence, its decision to immediately purchase 1.57 million shares in violation of that promise is curious at best. Even before it purchased those shares, Vector owned more than 1.6 million WatchGuard shares. Pltf.'s Opp'n (Dkt. # 126) at 11 n.5 (relying on Vector's "March 23 2006 Schedule D"); ¶ 55 (describing Mar. 26, 2006 13-D filing). It knew that a purchase of 1.57 million additional shares would require it to disclose those purchases to the public in an SEC filing. Indeed,

ORDER – 23

it made its mandatory SEC disclosure on March 26. This gives rise to a strong inference that Vector did not know that it was purchasing the additional shares in violation of an agreement with WatchGuard. The competing inference, that Vector knew that it had agreed not to purchase more shares, then unlawfully purchased 1.57 million of them and immediately disclosed its unlawful conduct to the SEC and the public, is weaker, to say the least. An inference of scienter sufficient to satisfy the PSLRA must be "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2404-05 (2007).

For the reasons stated above, the court finds that Plaintiff lacks standing to sue Vector for insider trading, and that even if it did not, the Second Complaint does not satisfy the PSLRA requirement that it give rise to a strong inference of scienter. This dispenses with Plaintiff's primary claims for insider trading. The court dismisses Plaintiff's derivative claims under Sections 20(a) and 20A of the Exchange Act (15 U.S.C. § 78t(a), 15 U.S.C. § 78t-1) because of the lack of a predicate violation. *See* Securities Ord. at 14 (citing *Johnson v. Alijan*, 490 F.3d 778, 781 n.11 (9th Cir. 2007), and *Paracor Fin., Inc. v. GE Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996)).

## IV. CONCLUSION

For the reasons stated above, the court grants Defendants' motions to dismiss (Dkt. ## 119, 121, 122) and dismisses the Second Complaint. The court dismisses the complaint with prejudice and without leave to amend. The court's review of Plaintiff's oppositions to the instant motions shows that it has not requested leave to amend other than to add a plaintiff with standing to sue for insider trading. Even if it had, the court has broad discretion to refuse leave to amend, particularly where it has already given a plaintiff an opportunity to remedy a defective complaint. *Metzler*, 540 F.3d at 1072. In this case, Plaintiff gives the court no reason to believe that it could state a viable claim if it were permitted to amend its complaint again.

ORDER – 24

The clerk shall not enter judgment at this time. The court will enter judgment after it resolves the issues described in its September 23, 2008 order to show cause.

DATED this 30th day of March, 2009.

_____
The Honorable Richard A. Jones
United States District Judge