HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PENNSYLVANIA AVENUE FUNDS,

    Plaintiff,

    v.

EDWARD J. BOREY, et al.,

    Defendants.

CASE NO. C06-1737RAJ

ORDER

## I. INTRODUCTION

In this order, the court resolves the remaining issues pending from its September 3, 2008 order to show cause. Dkt. # 138. For the reasons stated below, the court declines to impose sanctions beyond an admonishment that the record gives rise to a strong inference that Plaintiff's counsel made allegations in Plaintiff's second amended complaint that conflicted with facts known to them, and did so for an improper purpose.

## II. BACKGROUND & ANALYSIS

The court begins with a brief overview of the procedural posture of this action and the circumstances that led it to issue the order to show cause. It ends with a review of Plaintiff's response to the order to show cause and the court's conclusions.

**A.    The September 2008 Order to Show Cause**

The court resolved this case on its merits nearly a year ago, in its March 30, 2009 order dismissing with prejudice the second amended complaint ("Second Complaint") of

ORDER – 1

Plaintiff Pennsylvania Avenue Funds. The court's decision on Defendants' three motions to dismiss the Second Complaint was delayed, however, because the court issued a September 3, 2008 order that Plaintiff and its counsel show cause why the court should not impose sanctions based upon questionable allegations in the Second Complaint.

Ultimately, the court decided to resolve the motions to dismiss before addressing Plaintiff's response to the order to show cause. The Second Complaint did not survive Defendants' motions, for all of the reasons stated in the court's March 30 order. In that order, however, the court declined to enter judgment until it had resolved the issues it raised in the order to show cause.

Nearly a year has passed since the court dismissed the Second Complaint with prejudice. In that time, the court has chosen to devote its resources to other cases on its docket, particularly because it had already devoted so much time to this case in the course of resolving Defendants' motions to dismiss the first amended complaint ("First Complaint") and the Second Complaint. In remarking on the court's expenditure of resources, the court cannot ignore that Defendants no doubt invested substantial time and hundreds of thousands of dollars in attorney fees in their responses to the First and Second Complaint. Ordinarily, there would be no reason to make these observations. This court exists to hear disputes within its jurisdiction, and its resources are meant to be expended in resolving those disputes. Similarly, although a defendant enmeshed in a lawsuit often wishes it could avoid the burdens of a defense, we typically consider those costs to be an unavoidable consequence of our adversary system of justice. In this case, however, the court is left with grave concerns that its resources and Defendants' resources were expended on allegations that Plaintiff's counsel knew were inconsistent with facts known to them. There is evidence that the court's and Defendants' investments of resources in this case were not the consequence of the resolution of a bona fide dispute, but rather a burden imposed by counsel willing to ignore facts to advance this lawsuit beyond the pleading stage and into discovery.

ORDER – 2

The order to show cause describes the court's concerns in detail, and the court will offer only a summary of that description here. Briefly, this action arises from the going-private merger of WatchGuard Technologies after its purchase by FP, a private equity firm. Vector, another private equity firm, had been the only other entity that made a bid to acquire WatchGuard. Vector entered into an agreement with FP to split the post-merger company between them. WatchGuard shareholders voted in favor of the merger, which paid them $4.25 per share.

Enter Plaintiff, who sued WatchGuard's board of directors, FP, Vector, and others. Because the suit was based in part on claims subject to the discovery stay provisions of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(3)(B), the court stayed all discovery pending Defendants' motions to dismiss. After abandoning its initial complaint in the wake of an onslaught of motions to dismiss, Plaintiff filed the First Complaint, which Defendants attacked with three motions to dismiss. A key element of the First Complaint was the allegation that FP and Vector entered a "secret agreement" to depress the acquisition price of WatchGuard to their benefit. In three orders issued in February 2008, the court granted Defendants' motions to dismiss. It gave Plaintiff limited leave to amend.

Enter Plaintiff again. This time, it filed a second amended complaint ("Second Complaint"), and this time, the "secret agreement" between FP and Vector was missing. According to the Second Complaint, rather than colluding to acquire WatchGuard on the cheap, FP and Vector were bidding against each other for the right to acquire WatchGuard. Only after the auction ended and Vector threatened legal action did FP agree to split the merger proceeds with Vector. Frustrating the auction was Edward Borey, WatchGuard's chairman and CEO. He intentionally took a variety of actions to ensure that Vector did not acquire WatchGuard, because only FP would promise him a position as interim CEO of the post-merger company. By sabotaging Vector's acquisition efforts, Mr. Borey depressed WatchGuard's purchase price.

ORDER – 3

Another feature of the Second Complaint was the repetition of allegations that Vector had engaged in insider trading by acquiring about 1.5 million shares of WatchGuard while in possession of inside information. Ordinarily, repetition of allegations would be no cause for concern, except that the court and Defendants had already noted that the allegations were nearly incomprehensible. Insider trading requires the trader to either buy stock based on inside information that its market price is below its true value, or to sell it based on inside information that the market price overvalues the stock. Insider trading harms only those who sell to an inside buyer, or those who buy from an inside seller. Courts have fashioned a "contemporaneous trading rule" to ensure that only persons who have plausibly been harmed by insider trading have standing to sue. The court and Defendants pointed out in addressing the First Complaint that Plaintiff's insider trading allegations were a jumble of mismatched allegations of purchases and sales that made it impossible to ascertain who had done what and who had been harmed in the process. Amending the First Complaint to fix these defects should have been a trivial task. The Second Complaint remedied some of the defects, ignored many of them, introduced new defects of the same type, and generally gave the court the impression that Plaintiff was deliberately pleading in a way that made it impossible for the court or Defendants to know what it was alleging.

These twin concerns led to the court's September 3, 2008 order to show cause. As to the switcheroo of the "secret agreement" between Vector and FP for Mr. Borey's sabotage of Vector's effort to compete with FP, the court had two concerns. First, that the two complaints were drafted such that it was impossible that the "secret agreement" and Mr. Borey's sabotage could have both occurred, suggesting that Plaintiff lacked any factual support for one or both sets of allegations. Second, that if Plaintiff lacked factual support for its allegations, there was an inference that the allegations were made for an improper purpose. As to Second Complaint's repetition of incomprehensible insider trading allegations, the court found that this gave rise to the inference that Plaintiff had

ORDER – 4

"deliberately used obfuscatory pleadings for the purpose of making it difficult to attack those pleadings in a motion to dismiss." Sept. 3 Ord. at 9. The court directed Plaintiff to show cause why the court should not impose sanctions under either Fed. R. Civ. P. 11 or 28 U.S.C § 1927. The court also explained that it had no means of knowing whether to attribute Plaintiff's conduct to Plaintiff itself or its counsel, and that the response to the order to show cause should clearly differentiate between Plaintiff and its counsel.

**B.      Plaintiff's Response to the Order to Show Cause**

A review of Plaintiff's response to the order to show cause leads the court to conclude that Plaintiff's counsel is responsible for the conduct described in this order. In response to the order to show cause, Plaintiff submitted two declarations from its attorneys, and neither declaration suggests that Plaintiff had any involvement. The court therefore finds that Plaintiff's counsel, specifically the two attorneys who submitted declarations, are primarily responsible for the conduct described herein.

> **1.      Counsel Adequately Explained Its Defective Insider Trading Allegations.**

Plaintiff's response convinces the court that sanctions are inappropriate with respect to the insider trading allegations. Counsel took responsibility for the numerous defects in the insider trading allegations of the Second Complaint, and clarified what those allegations meant. They provided further clarification in their response to Vector's motion to dismiss the Second Complaint. The clarifications lessened the harm arising from the allegations, because they permitted Vector and the court to determine what the allegations were, and to determine their adequacy.

The court's decision not to impose sanctions should not be read as excusing counsel's conduct. It is one thing to make a mistake (or in this case, dozens of mistakes) in pleading; it is another to repeat those mistakes despite being told by the court and by an opposing party not only that mistakes had been made, but that the mistakes needed to be corrected. Moreover, Vector provided evidence that it informed counsel that it had

ORDER – 5

repeated the same mistakes in the Second Complaint, and counsel nonetheless declined to fix them. One of the reasons the court dismissed the insider trading allegations was that Plaintiff had no standing to pursue them because it had not traded contemporaneously with Vector. It is hardly a leap, therefore, to imagine that counsel repeated their "mistakes" in the hope of obscuring that Plaintiff had no standing to sue Vector for insider trading. Ultimately, the court cannot determine with certainty whether counsel's "mistakes" in the insider trading allegations were inadvertent or strategic. That uncertainty, coupled with counsel's admission of their mistakes and clarification of their pleadings, leads the court to decline to impose sanctions.

### 2. Counsel Provided No Adequate Explanation for the Second Complaint's Allegations Regarding FP and Vector's Competition to Acquire WatchGuard.

As to the shift between the First and Second Complaint from FP and Vector's "secret agreement" to Mr. Borey's sabotage of an open competition between FP and Vector, the court's concerns are not so easily dismissed. Counsel's response to the order to show cause is essentially that they had a reasonable basis to make the secret agreement allegations of the First Complaint based on publicly available information about the WatchGuard merger. From that information, they knew that FP and Vector's bid prices for WatchGuard decreased over time, and they knew that FP and Vector later entered a publicly disclosed agreement to split the post-merger company between them. From this, counsel surmised that FP and Vector agreed in secret (before their publicly disclosed post-auction agreement) to rig the bidding to depress WatchGuard's acquisition price. Counsel had no evidence to support that theory other than what was disclosed in public documents, along with secondary sources addressing collusion in the private equity market generally. None of the secondary sources revealed any information about Vector, FP, or WatchGuard.

ORDER – 6

Counsel's proffered motivation for the changes in the Second Complaint was their receipt of an e-mail on February 8, 2008 from an unidentified witness who claimed to have inside information on WatchGuard. The court was aware of this e-mail long before the Second Complaint existed, because counsel attached it to an eleventh-hour request for judicial notice in support of their opposition to the motions to dismiss the First Complaint. Dkt. # 103. Among other revelations, the e-mail states that "[a]ll of the former vice presidents knew that ed borey and mike piraino where going to be kept on as interim executives if FP had purchased watchguard and that is why ed borey wanted to go with FP." *Id.* (errors and capitalization in original). That allegation is consistent with the Second Complaint's focus on Mr. Borey's conduct. Much of the remainder of the e-mail, however, is not. As to FP and Vector's conduct, the e-mail is a hodgepodge of inconsistent allegations. It contended that "Vector and FP worked to drive the price down paid by Watchguard in 2006," that "fp and vector worked to drive the price down," *and* that "vector offered the higher numbers but ed borey knew vector would not keep him . . . so that is why he looked for another buyer and along came fp who agreed to keep ed on as interim ceo." *Id.* (errors and capitalization in original).

The only way to harmonize the e-mail's allegations is to assume that Vector and FP were initially competitors for WatchGuard, but then entered an agreement to collude with each other that led to their successively lower bids for WatchGuard. There is no other way that Vector could have "offered the higher numbers" yet still worked with FP "to drive the price down." Their collusion must have come after Mr. Borey initially indicated his preference for FP's offer.

Counsel ignored the conflicting allegations of the e-mail, and contend that the e-mail "alert[ed] Plaintiff's counsel that the root cause (from [the unidentified witness's] insider perspective) of aberrational offers was Borey's self-dealing." OSC Response (Dkt. # 139) at 7. As noted, the e-mail said no such thing: it contended that the root cause of the so-called "aberrational" offers was that FP and Vector colluded to lower the price.

ORDER – 7

The e-mail provides no basis to abandon the "secret agreement" allegations in favor of the auction sabotage theory of the Second Complaint.

To draft the Second Complaint, counsel had to ignore what the unidentified witness was claiming regarding FP and Vector's collusion while simultaneously relying on the witness's account of Mr. Borey's malfeasance. The Second Complaint contains numerous allegations that Vector was trying to top FP's bids until the very end of the auction. 2d Compl. ¶¶ 72-78. The e-mail, in stark contrast, contends that Vector and FP worked together to drive down the merger price. Even at the eleventh hour, as the WatchGuard board moved to finalize FP's final bid, the Second Complaint alleges that Vector attempted to make a topping bid and Mr. Borey convinced the board to ignore it. *Id.* ¶ 77. The e-mail is inconsistent with these allegations.

The court focuses on the e-mail because counsel offers no other specific information about what they learned from the unidentified witness. According to counsel, the February 8, 2008 e-mail was the first in a series of approximately forty e-mails exchanged between them and the unidentified witness. Counsel did not provide the additional e-mails to the court, although they offered to do so in camera. Counsel also hired an investigator to corroborate the witness's information. Nothing in counsel's description of the e-mail correspondence or of their dealings with the investigator, however, remotely addresses the central question: how could Mr. Borey have been sabotaging Vector's bids in favor of FP's bids while Vector and FP were colluding to lower their bids? More importantly, how did counsel file a Second Complaint that excised the unidentified witness's insistence that FP and Vector colluded and substituted allegations that Vector attempted to outbid FP until the very end of the auction?

Absent an explanation from counsel, the court can only conclude that counsel selected accusations they liked from the unidentified witness's account, ignored the accusations they did not like, and substituted inconsistent allegations that they preferred. Counsel ignored known facts from an insider while drafting the Second Complaint, but

ORDER – 8

nonetheless relied on other facts from the same insider as a basis for a new theory of wrongdoing.

There is an obvious motivation for counsel's conduct. The court had rejected the First Complaint, and without new allegations, Plaintiff would never proceed beyond the pleading stage, and would never commence discovery. Discovery offered two advantages for Plaintiff. First, discovery could yield evidence of some kind of wrongdoing, in which case it could amend its complaint to fit the new evidence. Second, the cost of discovery might well force Defendants to consider a settlement. The same concerns animate many securities lawsuits, because the PSLRA requires plaintiffs to craft a complaint that can survive a motion to dismiss before taking discovery. That is no basis, however, for concocting allegations that contradict known facts.

Were its resources infinite, the court might insist that counsel disclose all of their communications with the unidentified witness, as well as all other information supporting the allegations in the Second Complaint, and then appear at a hearing in which they would explain to the court how they could have made the allegations in the Second Complaint in good faith. But the court's resources are not infinite. Indeed, despite strong evidence of conduct that is at least questionable, and possibly sanctionable, the court has taken no action on this matter since its order dismissing the Second Complaint in March 2009. The court oversees a docket of a few hundred cases. To divert resources from those cases to devote even more attention to a case that has already consumed so many resources seems a disservice.

A year has passed, and the court concludes that the best resolution for this matter is to close it, enter judgment for Defendants, and leave Plaintiff and its counsel with no sanction more severe than an admonishment. The court cannot say with certainty how the Second Complaint came to be. It cannot say with certainty whether counsel intentionally concocted allegations that were not merely without a factual basis, but were inconsistent with facts known to counsel. Perhaps there is a rational explanation for

ORDER – 9

making allegations that wholly contradict the unidentified witness's insistence that FP and Vector colluded. Perhaps there is no rational explanation, and the Second Complaint merely reflects counsel's inattention, haste, or negligence. The court can say with certainty, however, that counsel's conduct gives rise to a strong inference of improper conduct. Only the court's desire to move on to other matters prevents it from conducting additional proceedings.

### III.  CONCLUSION

For the reasons stated above, the court declines to impose monetary sanctions against Plaintiff or its counsel based on the order to show cause, although it admonishes counsel as stated above. For the reasons stated in its March 30, 2009 order and its prior orders, the court DISMISSES this action with prejudice, and directs the clerk to enter judgment for Defendants.

DATED this 8th day of March, 2010.

_____
The Honorable Richard A. Jones
United States District Judge

ORDER – 10